Mary CARR, Ind. & Rep. of Est. of Nathan Henry Carr, Henry & Mary M. Johnson Carr, Appellants,

v.

JAFFE AIRCRAFT CORPORATION and Jafftech Industries, Inc., Appellees.

No. 04–90–00497–CV.

Court of Appeals of Texas, San Antonio.

Aug. 26, 1992.

Rehearing Denied Nov. 24, 1992.

Writ granted Sept. 29, 1993.

Charles A. Nicholson, Scott Roberts, Law Offices of Pat Maloney, P.C., San Antonio,

Risley C. Triche, Law Offices of Risley C. Triche, Napoleonville, LA, Pat Maloney, Sr., *Law Offices of Pat Maloney, P.C.* and Warren Weir, Weir & Alvarado, P.C., San Antonio, for appellants.

Kenneth L. Fuller, Fuller & Fuller, P.C., San Antonio, and John H. Martin, Deborah G. Hankinson, and Beverly Ray Burlingame, Thompson & Knight, P.C., Dallas, for appellees.

Before PEEPLES, CARR and GARCIA, JJ.

## OPINION

GARCIA, Justice.

Appellants, Mary Carr, individually and as representative of the estate of Nathan Carr, deceased, and Henry and Mary Johnson Carr, individually, filed suit against appellees, Jaffe Aircraft, Corp., Jafftech Industries, Inc., and others, alleging various causes of action for negligence and strict products liability.

The case proceeded to trial on appellants' negligence cause of action only, and the trial court submitted appellee's liability issue to the jury in one question: "Did the negligence of Jafftech/Jaffe Aircraft Corporation proximately cause the occurrence in question?" Based on the jury's negative answer to the submitted question, the trial court entered a take nothing judgment.

Appellants challenge the legal and factual sufficiency of the evidence. They raise two points of error: (1) the trial court erred in overruling appellants' motion for judgment notwithstanding the verdict and motion for new trial because of the jury's failure to find that appellees' negligence was the proximate cause of the airplane crash was so against the great weight and preponderance of the evidence as to be manifestly unjust and (2) that the court erred as a matter of law because appellants conclusively established negligence as a matter of law.

If an appellant attacks the legal sufficiency of an adverse finding on an issue on which he had the burden of proof, he must demonstrate on appeal that the evidence con-clusively established all the vital facts in support of the issue. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). If an appellant attacks the factual insufficiency of a jury finding concerning an issue upon which he had the burden of proof, he must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *See Raw Hide Oil and Gas, Inc. v. Maxus Exploration Co.,* 766 S.W.2d 264, 275–76 (Tex.App.—Amarillo 1988, writ denied). And, in determining the factual sufficiency of a jury's failure to find, this court must examine the entire record. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). Our court may reverse and remand a case for a new trial when it concludes that the finding or "non-finding" is against the great weight and preponderance of the evidence. *See* W. Wendall Hall, *Standards of Appellate Review in Civil Appeals,* 21 ST. MARY'S L.J., 865, 906–16, (1990).

A long and meticulous review of the record before our court reveals the following undisputed facts:

On January 9, 1989 Nathan Carr was killed in an airplane crash. He was the sole passenger in small piston-engine plane that was known as the SA–29, which had been designed and built in 1984 by Mr. Ed Swearingen and his San Antonio Company, Jetcrafters, Inc. It was the prototype of an airplane known as the SX–300, marketed and sold in kits for "home" assembly. In 1987, Mr. Swearingen entered into an agreement with appellee, Jafftech, to develop a new airplane based on the SA–29 which could be sold as a pilot-trainer airplane to the U.S. military. The new airplane was called the SA–32T and was to be a better and much faster turbine-driven airplane, designed to withstand the aerobatic maneuvers necessary for military use. Mr. Forest Molberg, vice-president of Jafftech, conducted most of the discussions with Mr. Swearingen regarding the contractual agreement. After the SA–29 prototype was sold to Jafftech, it was re-painted to resemble a military airplane: the instrumentation was rearranged to reflect a conventional instrumentation layout for a military fighter plane, the airspeed indicator was changed to a military configuration, and

the "red line" on the airspeed indicator was increased. The "red line" on an airplane speed indicator marks the maximum speed at which it is permissible to operate the airplane under any circumstances. The "red line" on the SA–29 prototype was established by its designer and manufacturer, Mr. Swearingen, at 274 knots. This established "red line" of 274 knots on the prototype is ten percent below the maximum speed that the airplane was designed to operate. When the airspeed indicator was changed to military configuration, the "red line" was increased to 304 knots, thirty knots over the airplane's designed limitations. Later, the "red line" was increased a second time to 348 knots, approximately seventy-five knots over the airplane's designed limitations.

On January 9, 1989, some thirteen months after the prototype had been purchased from Mr. Swearingen, Jafftech had Mr. Molberg fly the SA–29 prototype to Wright–Patterson Air Force Base in Ohio where arrangements had been made to demonstrate it to Air Force officials who were interested in purchasing new pilot trainer airplanes. At about 9:00 a.m. on the morning of January 9, the plane took off from the air base to the demonstration area. Mr. Molberg was the pilot and appellants' decedent, Nathan Carr, an Air Force captain, the sole passenger, was an observer. Several minutes into the flight, while the plane was traveling at 238 knots on a straight flight path, the right wing fell off as the result of metal fatigue. The airplane crashed killing both Mr. Molberg and Captain Carr. The only contested issue at trial was the cause of the metal fatigue.

A review of the testimony offered at trial reveals the following:

(a) Mr. Swearingen testified that both Mr. Molberg and other mutual acquaintances told him that Mr. Molberg was doing aerobatic maneuvers in the SA–29 prototype at air shows; that he had designed the prototype to be flown only as a transportation airplane and had neither designed nor manufactured it to be an air show plane; that in both 1984 when the prototype was built and later in 1987 when it was sold and delivered to appellee, a maximum "4G" gravitational limitation had been placed on the plane; that during an annual recertification after the airplane was sold to Jafftech, the "4G" limitation was removed from the airplane; that he had concern that during the low-altitude, high-speed maneuvers might over-stress the plane to a point where a structural failure might occur; and that he had had two conversations with Mr. Molberg where he expressed "considerable concern" with doing air show work and suggested that "he [Mr. Molberg] let me [Mr. Swearingen] build a wing for that airplane that was appropriate for that kind of activity" and "I told him [Mr. Molberg] that I was concerned that we would have a wing failure and fatal flight in the airplane. . . ." He further testified that in his opinion that the wing metal fatigue was caused by "high-speed flight" by Mr. Molberg; that it was not reasonable nor was it prudent for Mr. Molberg to operate the plane at excessive speeds on a routine basis; that Mr. Molberg's repeated conduct in knowingly exceeding the design capabilities of the prototype was a "conscious disregard for the airspeed limitations that I established on the airplane and for the 'G' loading that I had established on the airplane"; and that he had no doubt in his mind that Mr. Molberg knew the specific design restrictions that had been placed on the plane when it was designed and manufactured.

(b) Mr. Howell Jones, a professional engineer who designs and builds airplanes, was a friend of Mr. Molberg's and had seen him fly the prototype, testified that Mr. Molberg told him that, in Mr. Molberg's opinion, the airplane could not be broken; that he had already flown it over 100 miles per hour over the "red line"; and that he frequently, routinely, flew the airplane eighty-five miles an hour above the "redline"; and that Mr. Molberg had on one occasion knocked himself completely unconscious in the airplane with "G" forces. And further, Mr. Jones told Mr. Molberg "as a good friend of mine that he was going to kill himself if he kept doing that" and that he told Mr. Molberg that his flying the airplane at speeds in excess of the "red line" was "a conscious disregard for his own safety and safety of others." After the crash, Mr. Benjie Coleman, an investigator for the National Transportation Safety

Board, the federal agency that investigated the crash, contacted Mr. Jones to see if he had any opinion on the cause of the crash. Mr. Jones said, "And I told him I certainly did. And I related the conversation that I'd had with Forest [Molberg]." It was the opinion of Mr. Jones that "it was the abuse of the airplane by Molberg that caused the crash."

(c) Mr. John Butler, a mechanical engineer and pilot with over 17,000 hours of flying time testified that in 1988 he met Mr. Molberg at an air show, and while having lunch with Mr. Molberg told him "that he routinely flew the prototype to 400 m.p.h. ... then he would pull it up vertical and go almost out of sight."

(d) Mr. James Ryan is the president of the company that designed and manufactured the retract system for the landing gear on the SA–29 prototype. The retract system was designed to be held up by trapped hydraulic pressure in such a manner as to require approximately "6G" of holding force. One would need to exceed the "6G" force for the landing gear to reverse and come down. In 1988, Mr. Ryan met Mr. Molberg at an air show in Wisconsin. Mr. Molberg told Mr. Ryan that the landing gear was coming out of the wheel well during maneuvers and he wanted to know what could be done about that. Mr. Ryan advised him that the landing gear already was being held at "6G's" of force which he understood equaled or exceeded the limit of the G loading of the airplane. In other words, the landing gear had already been set at the maximum G force at which the airplane could be flown. It should not have come down unless Mr. Molberg was exceeding the design limits of the airplane. Mr. Molberg told Mr. Ryan, as he had told Mr. Butler, that he had flown the airplane at 400 m.p.h., to which Mr. Molberg replied that the "airplane was indestructible." Mr. Molberg further told Mr. Ryan that he "routinely" flew the prototype in excess of the "red line" speed.

(f) Mr. William Seward, appellees' witness, testified on cross-examination that the "red line" should never be changed without the manufacturer's approval; that a person who changed the "red line" without such approval would be "exercising a conscious disregard for the designing specifications of the plane"; that a pilot should "never exceed the manufacture's designed "red line" for the particular plane"; and that if Mr. Molberg routinely exceeded "red line" and routinely flew the airplane at 400 m.p.h., it would be "in absolute conscious disregard for the designed specifications of the airplane."

(g) Mr. John Parsons, another of appellees' witnesses, testified that a pilot should never exceed the "red line" and to do so routinely would be a conscious disregard for the safe operation of the airplane.

(i) Mr. Douglas Jaffe, Jr., who owns 100% of the Jafftech Industries, Inc. stock, testified that Mr. Swearingen "would be the best source regarding the crash." He agreed that Mr. Swearingen told him "that this airplane was not to be used for air show work"; that he believed Mr. Swearingen had the two conversations with Mr. Molberg and that Mr. Swearingen was a truthful person.

In the present case, negligence and proximate cause were submitted to the jury in one question. Thus, the jury's "no" answer to the liability question could have resulted from either (1) their failure to find Mr. Molberg was negligent, or (2) their finding that Mr. Molberg was negligent, and failure to find that negligence was a proximate cause of the crash. In their brief, appellees concede that the cause of the wing failure was metal fatigue, which Mr. Swearingen attributed to Mr. Molberg's "high-speed flight." There was reference in the record attributing the metal fatigue to a possible pre-existing crack in the wing. This testimony, however, was insignificant compared to the overwhelming testimony concerning pilot abuse as the cause of the metal fatigue. Further, appellees contend that foreseeability, a necessary element of proximate cause, was not established. In response to appellees' cross-examination, Mr. Swearingen stated that he could not foresee the wing falling off on the day of the airplane crash. However, the correct test in establishing foreseeability is found in *Brown v. Edwards Transfer Co., Inc.*, 764 S.W.2d 220, 223 (Tex.1988), written by Justice Gonzalez:

Under Texas law, proximate cause encompasses the elements of cause in fact and foreseeability. *Williams v. Steves Indus. Inc.*, 699 S.W.2d 570, 575 (Tex.1985)....  Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the danger of his act to others. [*Nixon v. Mr. Property Management Corp.*, 690 S.W.2d 546, 549–50 (Tex. 1985).] *However, foreseeability does not require that the actor foresee the particular accident or injury which in fact occurs. Trinity River Authority v. Williams*, 689 S.W.2d 883, 886 (Tex.1985). (Emphasis added).

On direct-examination regarding the issue of foreseeability Mr. Swearingen testified:

Q: [By Mr. Maloney, Jr.]  Just so we can fully understand the exact extent of the language you used to make sure that Mr. Molberg understood the seriousness of the situation, can you tell the jury the exact words that you told Forest [Molberg]?

A: [By Mr. Swearingen] Well, I don't know if I remember the exact words, but I told him that I was concerned that we would have a wing failure and a fatal flight in the airplane, those kinds of things.  He was an extremely professional pilot and he fully understood what it meant to overstress an airplane to the point where you'd have a structural failure; it's always fatal.

Thus, applying the correct test of foreseeability to Mr. Swearingen's testimony, we disagree with appellees' argument on foreseeability.

▮ Therefore, after reviewing the entire record concerning both negligence and the correct foreseeability test in assessing proximate cause and applying the appropriate appellate review standards, we find that while the evidence does not conclusively establish negligence and proximate cause as a matter of law, the jury's "non-finding" on these issues is against the great weight and preponderance of the evidence.  This court may remand a case for a new trial when we conclude that the jury's failure to find a fact is so against the great weight and preponderance of the evidence. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 652 (Tex.1988).  Every expert who testified concluded that the cause of the airplane crash was a failure of the structural integrity of the wing.  There was no evidence of any other pilot error, adverse or inclement weather conditions, equipment failure, manufacturing or design defect, or any act by appellants' decedent that contributed to his death.

The only evidence in the record was that the wing failure was a result of metal fatigue.  The sole evidence that anything other than pilot abuse of the plane came from the testimony of Mr. Jaffe.  He testified that the airplane had been put through very rigorous use and that he heard another person, Marion Dees, say that "in the early stages of testing this airplane, ... that a crack [in the wing] could have occurred then."  This hearsay statement is the sole evidence that conflicts with the testimony of every other witness as to the cause of the metal fatigue in the airplane's wing.

Appellate courts have overturned non-findings regarding manufacturer's liability that were against the great weight and preponderance of the evidence.  For example, in *Ruiz v. Flexonics*, 517 S.W.2d 853 (Tex.Civ. App.—Corpus Christi 1974, writ ref'd n.r.e.), the court overturned a jury's failure to find that a manufacturer's allegedly defective hose was the producing cause of the plaintiff's injuries.  In that case, the defendant manufactured a hose which was used to connect the fuel supply to a space heater prior to an explosion and fire.  All of the witnesses testified that the defendant's hose was the producing cause of the fire.  Only one witness testified that the fire was caused by something other than the hose.  The court discounted that witness' testimony on the basis that it was based on a presumed fact. *Ruiz*, 517 S.W.2d at 859.  The court held that the jury's failure to find was so against the great weight and preponderance of the evidence as to be wrong and unjust and remanded the cause for a new trial.

Likewise, in our case, every witness qualified to give an opinion said that the cause of the wing failure was the repeated and routine aerobatic maneuvers and excessive speed at which the plane was flown by Mr. Molberg.  Moreover, "a vital fact," like a crack in the

airplane, "requires proof by evidence amounting to something more than a mere scintilla. A presumption of fact cannot rest upon a fact presumed." *Ruiz*, 517 S.W.2d at 859. Only Mr. Jaffe offered a different version based on a statement he had heard; but even then, he testified and admitted his respect for Mr. Swearingen's credibility on the matter. Accordingly, appellant's second point of error is overruled, but their first point of error is sustained. We reverse the judgment and remand the cause to the trial court.

PEEPLES, J., dissents and files an opinion.

PEEPLES, Justice, dissenting.

It is implicit in the notion of law—rules known in advance, applied consistently and evenhandedly to all litigants—that judges must sometimes apply rules they personally do not like. Appellate justices must sometimes affirm judgments they might not have rendered if they had sat as the trier of fact. We are not the only decisionmakers in the legal system. The legislature and the supreme court set rules that we must faithfully apply, and the trier of fact decides fact questions which we ordinarily must accept. The rules that we live under mandate that we can set aside a jury verdict only under the most limited of circumstances.

In the last few years the supreme court has stressed again and again that courts of appeals may not sustain factual sufficiency points and reverse judgments based on jury verdicts without detailing the evidence and stating why the verdict was so against the weight of the evidence as to be manifestly unjust and wrong. It is not enough for an appellate court to review the evidence and state its conclusion that the evidence is factually insufficient. *See, e.g., Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 652 (Tex. 1988); *Lofton v. Texas Brine Co.*, 720 S.W.2d 804, 805 (Tex.1986); *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 594–95 (Tex. 1986); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986).

In several instances the supreme court has reversed the court of appeals twice in the same case and sent the cause back for a second factual sufficiency analysis because the court of appeals did not faithfully detail the evidence and explain why it was factually insufficient. *See, e.g., Aluminum Co. of America v. Alm*, 785 S.W.2d 137 (Tex.1990); *Lofton v. Texas Brine Co.*, 777 S.W.2d 384 (Tex.1989); *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646 (Tex.1988). Needless to say, we must detail and consider all the evidence that supports a jury's finding, and we must state why the jury was not entitled to believe it.

The majority has not fairly applied the teaching of these cases. Here the majority holds that the jury's failure to find negligence and its failure to find proximate cause are against the weight of the evidence. But the majority has not fully and accurately recited the evidence bearing on the controlling issues. Indeed, the majority opinion does not even cite several pieces of evidence that *support* the jury's failure to find negligence and proximate cause.

Plaintiffs' theory was that on earlier occasions pilot Molberg had flown the airplane so fast that the metal in the right wing was stressed and fatigued, which caused the wing to fall off later when plaintiffs' decedent was Molberg's passenger in the plane, and that such a result was foreseeable. Proximate cause requires proof of "but for" causation and foreseeability. *See El Chico Corp. v. Poole*, 732 S.W.2d 306, 313 (Tex.1987); *Missouri Pac. R.R. v. American Statesman*, 552 S.W.2d 99, 103 (Tex.1977).

As to two of the three elements of plaintiffs' liability case—negligence and causation in fact—the jury's failure to answer "yes" was not against the weight of the evidence. If I am right about either negligence or but-for causation, the judgment should be affirmed.

*1. Negligence.* Under plaintiffs' theory, the act of negligence was Molberg's allegedly flying the plane past the "red line"—the speed beyond which flight may stress the plane beyond its designed capacity. Molberg died in the crash and therefore was not available to testify. Three witnesses testified that Molberg had told them he had flown the plane past the red line. Two of the witness-

es said Molberg admitted doing this "routinely." Even if this had been all the evidence on the issue of negligence, I think the jury was entitled to disbelieve the hearsay testimony involving a deceased declarant.

But there was other evidence. Several witnesses testified that Molberg was an exemplary pilot, and that they had flown with him or had seen him perform aerobatic maneuvers but had never seen him exceed the red line or overstress the plane.

Swearingen himself testified, "There wasn't anything wrong with operating that airplane that way a few times. But not every day." This amounts to a statement that when Molberg did aerobatic maneuvers, even if he exceeded the red line, it was not negligence unless it happened too often. Certainly the jury was entitled to conclude that it had not happened too often.

Swearingen also testified that Molberg told him he had not exceeded the red line, which directly contradicts the hearsay testimony. Swearingen testified:

Q ... Why didn't you go to Jan Molberg and warn her that her husband was abusing this airplane?

A In my conversations with Forest [Molberg], which was not very long before that, *Forest assured me that he was— while doing aerobatics, that he was doing gentle aerobatics, very gentle use of the controls, and that he was not exceeding the red line of the airplane and that he was not pulling more than 4 G's. And I believed him. I had heard rumors or reports that he was exceeding the limits, but he was very convincing and I'd known him for a long time. And I was reassured.*

*... I didn't think that it was hazardous to fly the airplane. I flew it myself.* (emphasis added)

In this passage, Swearingen directly contradicts the witnesses who said Molberg admitted exceeding the red line. If jury trial means anything, it means that the jury was entitled to believe Swearingen's testimony that Molberg said he did not exceed the red line when he performed aerobatics.

It is an abuse of our power to hold that a jury unjustly goes against the weight of the evidence when it does not believe hearsay testimony. This is especially true when other evidence contradicts the hearsay evidence. We must remember that the question for us is not what we would have decided, or what most juries would have decided, but whether this jury's failure to answer "yes" was so against the weight of the evidence as to be unjust and manifestly wrong. The majority has not explained *why* a jury may not disbelieve hearsay testimony, especially when other evidence directly contradicts it. Jurors are "the sole judges of the credibility of the witnesses and the weight to be given their testimony...." Tex.R.Civ.P. 226a(III).

*2. Causation in fact.* Expert witnesses testified that *assuming* Molberg had exceeded the red line speed as alleged, his conduct probably caused metal fatigue, which probably caused the fatal crash. But even if the jury believed the three witnesses to Molberg's hearsay statements, there was also evidence that Molberg's red-line overloads were not done often enough to stress the wing. An expert testified that to cause metal fatigue failure, a pilot would have to exceed the red-line speed "all day, every day," or every weekend, or at least on a regular basis. The jury could have credited this evidence and thought that whatever Molberg did did not cause metal fatigue, or did not cause the crash. Swearingen said that he did not think the plane had been stressed and that he flew in it without fear.

There was some indication in the evidence that the wing may have been stressed before Jaffe bought the plane—that is, that Molberg did not cause the stress and metal fatigue. But it makes no difference whether the record shows an alternate explanation for the crash. The majority is invading the jury's function when it says there is no other satisfactory explanation for the crash. The jury was entitled to conclude that the proof did not establish plaintiffs' theory that Molberg's alleged activities caused it, even if there was no other explanation. No rule of law that I know of requires a defendant to offer a non-culpable explanation for an accident. No one suggests that res ipsa loquitur applies to this case.

**78**

The jury's refusal to find cause in fact is within the evidence because the jury could have believed (1) that Molberg did not exceed the red line and stress the right wing, or (2) that he did not exceed the red line often enough to stress the wing. Those were issues presented by conflicting evidence, and the jury had the right to resolve the conflict either way.

*3. Foreseeability.* I agree with the majority that the testimony that Swearingen and Molberg could not have foreseen *this* accident does not refute proximate cause. The issue is whether this occurrence *or some similar occurrence* was foreseeable. Nevertheless, the jury had to find that a reasonable person in Molberg's position should have foreseen that taking the plane past the red line could cause metal fatigue and later cause a wing to fall off. *If* the jury had believed that Molberg had *routinely* exceeded the red line, I agree that the jury's implied failure to find that wing failure was foreseeable would be against the weight of the evidence. As stated above, however, the evidence was in conflict as to whether Molberg had exceeded the red line, and if he had, whether he had done it often enough to cause metal fatigue.

Defendants did not have to produce evidence to refute plaintiffs' theory of the case. A jury is given considerable leeway to decide that the party with the burden of proof has not met its burden. That is especially true when the central facts are disputed. It is even more true when the plaintiff's case rests on hearsay.

The majority has decided that the jury failed to follow the law and the evidence. But the majority's decision is itself a failure to follow the law, which severely limits an appellate court's authority to set aside a verdict. How can a court that ignores an unbroken line of supreme court cases expect litigants and trial courts to follow its own decisions?

Because the majority's decision cannot possibly be squared with *Cropper, Lofton, Alm,* and *Pool,* I dissent.