**Mary CARR, Individually and as Representative of the Estate of Nathan Henry Carr, Henry & Mary M. Johnson Carr, Appellants,**

v.

**JAFFE AIRCRAFT CORPORATION and Jafftech Industries, Inc., Appellees.**

No. 04–90–00497–CV.

Court of Appeals of Texas, San Antonio.

June 29, 1994.

Rehearing Denied Aug. 30, 1994.

Charles A. Nicholson, Scott Roberts, Pat Maloney, Law Offices of Pat Maloney, P.C., San Antonio, Risley C. Triche, Law Offices of Risley C. Triche, Napoleonville, Warren Weir, Weir & Alvarado, P.C., San Antonio, for appellants.

Kenneth L. Fuller, Fuller & Fuller, P.C., San Antonio, John H. Martin, Deborah G. Hankinson, Beverly Ray Burlingame, Thompson & Knight, P.C., Dallas, for appellees.

Before PEEPLES, HARDBERGER and CARR, JJ.[1]

## OPINION

HARDBERGER, Justice.

This is this court's second review of a fatal airplane crash in which the jury found no negligence against the defendants for the death of Captain Nathan Carr. The original decision, with Justice Peeples dissenting, held that the jury's failure to find negligence and proximate cause was against the great weight and preponderance of the evidence. *See Carr v. Jaffe Aircraft Corp.*, 863 S.W.2d 71 (Tex.App.—San Antonio 1992), *rev'd* 867 S.W.2d 27 (Tex.1993). The Texas Supreme Court determined that this court had not properly applied the standard of review as set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986), and *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646 (Tex. 1988). *See Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27 (Tex.1993). The case has now been remanded to this court for reconsideration of appellants' factual sufficiency challenge. *Id.* at 29.

Captain Nathan Carr was killed when the airplane in which he was a passenger crashed. Appellants sued appellees, Jafftech and Jaffe Aircraft Corp., alleging that Carr's death was caused by the negligence of Forest Molberg, who was the pilot of the airplane and an employee or agent of appellees.[2] Molberg was also killed in the crash. Question number one to the jury asked, "Did the negligence of Jafftech/Jaffe Aircraft Corporation proximately cause the occurrence in question?" The jury answered, "No." The only issue before us is whether that answer is against the great weight and preponderance of the evidence.

Before detailing the evidence, it is important to remember that this court is not jury number two. Whether this court, if it were the original factfinder, would have found for one side or the other is immaterial. A jury in this state has great power. Jurors are "the sole judges of the credibility of the witnesses and the weight to be given to their testimony." TEX.R.CIV.P. 226a, approved instruction III. Their decision is not to be tampered with lightly, whether it favors the plaintiff or the defendant. The jury has, and should have, the final word on facts.

The supreme court has stated the standard by which we review a factual sufficiency point: we assess all the evidence and reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool*, 715 S.W.2d at 635; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). "[I]n considering great weight points complaining of a jury's failure to find a fact, courts of appeals should be mindful that a jury was not convinced by a preponderance of evidence." *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988). Reversal is warranted only if a detailing of the

1. Justice Ron Carr assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to TEX.GOV'T CODE ANN. § 74.003(b) (Vernon 1988).

2. Edward Swearingen, the designer of the airplane, was also named as a defendant but ob-

tained a summary judgment in his favor. Jaffe Aerospace and Morris Douglas Jaffe, Jr. obtained directed verdicts in their favor during the trial. Appellants have not appealed any of these rulings.

evidence shows that the *great* weight of the evidence supports an affirmative answer. *Id.*

Courts should use great restraint in overturning a jury verdict on sufficiency of the evidence. In this case, there is evidence that negligence did, and did not, cause the death of Captain Carr. The jury chose to believe that negligence did not cause his death. There is sufficient evidence to support this view. We affirm the verdict.

■ The supreme court has held that a court of appeals, when reversing a judgment on insufficiency grounds, should detail in the opinion "the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias." *Pool v. Ford Motor Co.,* 715 S.W.2d at 635. This requirement also applies when the court reverses a jury's failure to find as against the great weight and preponderance of the evidence. *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d at 652–53. Although we affirm the judgment before us, we will nevertheless detail the evidence both in support of and contrary to the failure to find liability so that all parties are assured that we have conducted a thorough and diligent review of the record.

## I.  BACKGROUND

Edward Swearingen, the designer of the airplane at issue, testified that the airplane, the SA–29, was the prototype for a kit airplane advertised as the SX–300.[3] It was designed to be a high-performance, low-cost airplane for personal transport. After completion of the prototype, Swearingen entered a contract with Jafftech to develop a military trainer version of the airplane (the SA–32 and SA–32T). The SA–29 was thereafter sold to Jafftech to be used as a demonstrator for the military trainer. Forest Molberg was the pilot who demonstrated the airplane on behalf of Jafftech. The crash in which he and Captain Carr were killed occurred during a flight to an air force demonstration site.

There is no question that the airplane crashed because the right wing separated from the fuselage during flight. The issue before the jury was whether that separation was proximately caused by Forest Molberg's negligence in previously operating the airplane beyond its design specifications.

## II.  NEGLIGENCE

Appellants assert that Molberg negligently operated the SA–29 by repeatedly flying it at speeds beyond the red line[4] and exceeding the designer's G-load limitations.[5] Appellants particularly assert that Molberg was negligent by repeatedly performing stressful air show aerobatics for which the airplane was not designed.

Ed Swearingen testified that the original red line on the SA–29 was 274 knots. The airplane was designed "on paper" to be good to 9 G's and was tested to 6 G's. Swearingen stated that he gave the SA–29 prototype a 4–G limitation. No pilot's manual or manufacturer's literature accompanied the prototype, but Swearingen testified that Molberg was well aware of the airplane's design limitations. There is evidence, though, that Molberg had purchased the first of the SX–300 kits, which was essentially the same airplane as the SA–29 but carried a 6–G limitation.

Sometime after the sale of the airplane to Jafftech, a new airworthiness certificate was issued with the 4–G limitation removed. There is no evidence of who caused the limitation to be removed, why it was removed, or what the new G-load limitation was stated to be. Also after the sale, the airspeed indicator was changed to reflect a red line of 304 knots. The indicator was later changed a second time to indicate a red line of 348 knots.

---

3.  The airplane is referred to in the record both as the SA–29 and as an SX–300. For clarity, we will refer to it either as the prototype or the SA–29.

4.  The red line is the maximum speed at which an airplane may be flown. The red line is set 10% below the design high speed, a speed at which there is a zero safety factor. Only the experimental test pilot ever flies at the design high speed.

5.  G is a gravity factor. One G is the weight of an object at rest on the ground.

There is an abundance of evidence in the record that a pilot, with the exception of a test pilot, should never intentionally exceed an airplane's red line. There is also evidence that the red line on an airplane should never be increased without the manufacturer's consent and that Swearingen never consented to any increase in the red line of the SA–29. Thus, the higher red lines reflected on the altered indicators constitute some evidence of negligence. However, there is also evidence that the red line was changed on the indicator only for cosmetic purposes. The airplane was being photographed and demonstrated for purposes of promoting the SA–32T, which was intended to be a military trainer. The military version of the airplane would have a higher red line. Thus, there is evidence that the indicator may have been changed simply to show military buyers how the military trainer would look. This is supported by evidence that the instrument panel was altered to a military configuration and the airplane was repainted in military colors.

The explanation offered for increasing the red line on the indicator shows that this change does not necessarily prove that the actual red line of the airplane was ever altered or that the airplane was actually flown beyond the original red line. Thus, we turn to evidence bearing on whether Molberg did, in fact, fly the airplane beyond the original red line and otherwise operate it in an abusive manner.

Swearingen testified that he knew the airplane was being demonstrated at air shows and that Molberg was performing high-speed aerobatics. He stated that he warned Molberg of the dangers of doing air show work, which can greatly increase the G-loads on an airplane, because the airplane was not designed for it. He offered to build Molberg a wing for the airplane that would be suitable for air show work. Molberg assured him, though, that he was not exceeding the red line, was not pulling more than 4–G's, was performing only gentle aerobatics, and was not doing anything that would be harmful to the airplane. Swearingen, who had known Molberg for a long time and considered him to be an excellent pilot and honorable man, believed these reassurances.

Concerning the performance of aerobatics, Swearingen clarified at trial that not all aerobatics are harmful to an airplane. For example, he stated, "I'm not taking the position that skillfully accomplished, gentle aerobatics are going to hurt anybody's airplane." He also testified,

An airplane that does an occasional aerobatic maneuver that is within the limitations of the airplane is not being harmed. Now, an airplane that goes out and does that all day long, every day, is not going to last very long, unless it is specifically prepared for that level of service. That's what I'm talking about when I say it's not an air show airplane. That doesn't mean you can't do any aerobatics in it without harming something. That means you can't do aerobatics all the time without wearing it out.

. . . .

I never intended for the airplane to be an aerobatic airplane which means he would be doing it as a steady diet every day. . . . It's not a case of just doing it once in a while.

Consistent with this testimony, Swearingen admitted that he had seen Molberg perform aerobatics in the airplane that did not cause him any concern.

Appellants also offered testimony indicating that Molberg routinely exceeded the red line. For example, Swearingen testified that he heard reports that Molberg was exceeding the red line by 85 knots. Swearingen did not witness any instances of flying at excessive speed, though, and as noted above, he was convinced by Molberg's assurance that he was not abusing the airplane.

Howell Jones testified that Molberg told him he had flown the airplane 100 mph over the red line, he routinely flew 85 mph over the red line, he had pulled over 6–G's, and he once knocked himself completely unconscious. Jones saw Molberg fly the airplane at two air shows but could not determine whether he exceeded the red line. He admitted that it is difficult to judge speed from a distance. He also stated that the aerobatics that he witnessed did not cause him any concern.

Appellants introduced evidence to show that, if Molberg flew the airplane in a manner that caused him to black out, he must have exposed the airplane to over 4–G's. This would indicate negligent operation of the airplane. The statement by the witness, however, was that Molberg had "knocked himself out." It is not clear that being "knocked out" and "blacking out" are synonymous terms. One witness testified that being "knocked out" is not an aviation term. The jury may have concluded that if Molberg, an experienced pilot, used the phrase "knocked out" rather than "blacked out," he meant something other than unconsciousness caused by G-forces. In this regard, there is evidence that if Molberg "knocked himself out," this could have occurred during turbulence.

John Butler testified that Molberg told him he routinely flew the airplane up to 400 mph, which exceeded the red line. He did not, however, see Molberg fly the airplane. Butler agreed that certain aerobatic maneuvers are not harmful to an airplane such as the SX–300.

James Ryan testified that he overheard Molberg say he flew over 400 mph and that he believed the airplane to be indestructible. Molberg also told Ryan that he was having a problem with the landing gear coming out of the wheel well during certain maneuvers. Ryan, who manufactured the landing gear for the airplane, stated that over 6 G's would be required to overcome the hydraulic system and allow the landing gear to reverse and come out of the wheel well. Ryan saw the airplane fly at an air show, but admitted that he could not determine from watching whether it exceeded the red line. He stated that a small airplane appears to be going faster than does a larger airplane and that the SA–29 was designed to be a fast airplane.

Morris Douglas Jaffe, Jr., the owner of Jafftech, testified that Molberg would not consciously abuse the airplane. Other witnesses who knew Molberg and had flown with him also testified that he was an excellent pilot who would not disregard any limitations of which he was aware [6] and would not intentionally exceed the red line or do anything unsafe.

Our review of the record, as detailed above, demonstrates that appellants produced evidence that would support a finding that Molberg was negligent in his previous operation of the airplane. Had the jury found for the plaintiffs, we agree there would be ample evidence to support the verdict. But they didn't. And there is evidence to support the verdict they did reach. The issue is not whether the jury could have answered question one in the affirmative. The issue is whether its negative answer to question one is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Pool v. Ford Motor Co.,* 715 S.W.2d at 635.

■ In weighing the evidence before us, we are mindful that it is not our function to second-guess the jury's assessment of the credibility of the witnesses. *See Jones v. Tarrant Utility Co.,* 638 S.W.2d 862, 866 (Tex.1982); *Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 549 (1962); *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796 (1951). We note that appellants did not produce any direct evidence of Molberg's negligence. No witness stated that he actually observed Molberg fly the airplane in an abusive manner. Rather, the only evidence of abuse was statements made by a man who is now dead and cannot testify to refute them. The jury was not required to believe that Molberg's admissions of abuse were made or that they were true any more than it was required to believe Molberg's assurances to Swearingen that he was *not* abusing the airplane. The jury apparently chose, as was its right, to believe the latter.

Question one asked the jury to find both whether appellees were negligent and whether any such negligence was the proximate cause of the airplane crash. The jury's negative answer may have been based on a failure to find either negligence or proximate cause. For the reasons stated above, if the jury's answer was based on a failure to find negligence, that answer is not against the great

---

**6.** As noted above, there is some indication in the record that Molberg may not have been aware that the airplane had a 4–G limitation rather than the 6–G limitation placed on the SX–300.

weight and preponderance of the evidence. While we could end our analysis here, we will address the issue of proximate cause in the interest of completeness. We again apply the standard of review set forth above. *See Pool v. Ford Motor Co.*, 715 S.W.2d at 635.

### III. PROXIMATE CAUSE

■ Proximate cause requires proof both of cause in fact ("but for" causation) and foreseeability. *See El Chico Corp. v. Poole*, 732 S.W.2d 306, 313 (Tex.1987); *Missouri Pac. R.R. v. American Statesman*, 552 S.W.2d 99, 103 (Tex.1977). We will examine the evidence relevant to each element.

### A. Cause in fact.

■ Cause in fact, or "but for" causation, means that an actor's negligence was a substantial factor in bringing about the harm and that, without such negligence, the harm would not have occurred. *El Chico Corp. v. Poole*, 732 S.W.2d at 313; *Missouri Pac. R.R. v. American Statesman*, 552 S.W.2d at 103.

Appellants urge that the undisputed cause of the wing failure was metal fatigue. This is supported by Swearingen's testimony that it was his opinion that the wing separated due to fatigue failure caused by high-speed flight and gusty conditions putting high G-loads on the airplane. We note, however, that there is also some evidence in the record that the wing may have had a pre-existing crack at the joint or that the failure may have been caused early in the design of the airplane by heat treatment, the way the part was manufactured, or the welds.[7]

There is also evidence that the part of the wing that failed was the strongest part of the airplane; it had been designed to endure up to 10 G's and had been tested to 12 G's. Its failure could indicate either that the part was exposed to very high G-loads or that it possessed some flaw that caused its failure.

■ Even if the jury accepted that Molberg flew the airplane beyond the red line and exposed it to high G-loads during air show maneuvers, it could have concluded that these actions did not occur with the frequency necessary to cause catastrophic structural failure. Swearingen testified that performing aerobatics in the airplane "all day, every day" or "as a steady diet" would cause such structural failure. Swearingen stated that he was under the "impression" that Molberg did a lot of air show work, but the evidence does not establish the extent of that type of work or that it was performed "all day, every day." The airplane's logbook shows that it was flown to seven air shows. It was not established how many aerobatic flights were performed at these shows or what type of aerobatics were performed. Again, the only evidence of routine, consistent abuse of the airplane was recitations of what the dead man had said. As discussed above, the jury was not required to accept these statements as true.

Finally, we note that appellants relied heavily on the testimony of Swearingen and that the jury may have had cause to discount his credibility. Swearingen testified repeatedly that it was his opinion that the wing failure was caused by Molberg's abuse. Swearingen, however, was the designer and manufacturer of the airplane. Regardless of whether he faced any legal liability, his reputation in the aviation industry was certainly at stake. Further, although he testified he had been informed of Molberg's abuse and believed that catastrophic structural failure would be the result of such abuse, he admitted that he continued to fly in the airplane with Molberg without any concern for his own safety and he did not warn Molberg's wife or employer about any danger associated with flying in the airplane. Even after the accident, Swearingen was "at a loss" to explain its cause. Only after a year of investigation (during which time the present litigation was initiated) did he conclude that Molberg's abuse caused the crash.

---

7. Appellants persistently argue that the jury was precluded from believing that a design or manufacturing defect caused the accident in issue because Swearingen had previously obtained a summary judgment in his favor on this issue. There was no evidence of this summary judgment before the jury (nor should there have been) and the jury charge did not in any manner preclude the jury from considering such alternate causes.

█ It is not necessary for us to speculate on what alternative circumstance may have caused the crash in issue. Similarly, it was not appellees' burden to prove another cause for the crash. It is sufficient that the jury may not have been convinced by a preponderance of the evidence that the wing failed because of Molberg's manner of operation of the airplane. *See Herbert v. Herbert,* 754 S.W.2d at 144 (failure to find fact may be because the jury was not convinced by a preponderance of evidence). This conclusion is not against the great weight and preponderance of the evidence in this case.

### B. *Foreseeability.*

█ Foreseeability means that a person of ordinary intelligence should have anticipated the dangers his negligence creates for others. *El Chico Corp. v. Poole,* 732 S.W.2d at 313; *Missouri Pac. R.R. v. American Statesman,* 552 S.W.2d at 103. There was some confusion at trial concerning the issue of foreseeability. Appellees typically phrased their questioning on this issue in terms of whether it was foreseeable that the wing would fall off while the airplane was in level flight in good weather at Wright–Patterson Air Force Base on the day in question. Clearly this is not the relevant inquiry. "[O]nly the general danger need be foreseeable, not the exact sequence of events that produced the harm." *Lofton v. Texas Brine Corp.,* 777 S.W.2d 384, 387 (Tex.1989); *see also El Chico Corp. v. Poole,* 732 S.W.2d at 313. Thus, the inquiry is whether it was foreseeable that Molberg's manner of operating the airplane would cause structural failure leading to its crash.

Again, appellants rely heavily on the testimony of Ed Swearingen. Swearingen testified that Molberg "understood what it meant to over-stress an airplane to the point where you'd have a structural failure; it's always fatal." He stated that he twice warned Molberg of the danger of structural breakup.

█ Accepting this testimony as true, and accepting that Molberg did indeed routinely abuse the airplane, we would conclude that a failure to find foreseeability would be against the great weight and preponderance of the evidence. Again, however, resolution of the issue depends on an assessment of the credibility of the witnesses, a function reserved for the jury. *See Jones v. Tarrant Utility Co.,* 638 S.W.2d at 866.

For reasons stated above, the jury may have had reason to reject Swearingen's testimony regarding foreseeability. He testified that he did not caution Molberg that the wing could come off at any time because he did not believe that the airplane had been structurally damaged to that extent. He further stated, "I rode in the airplane personally a very short period of time before the accident and I wasn't the least bit concerned about the wing falling off." He did not warn Molberg's wife not to ride in the airplane and did not tell Molberg's employer that the airplane was dangerous or should be grounded.

After assessing the evidence both on cause in fact and foreseeability, we cannot conclude that, if the jury's negative answer to question one was based on a failure to find proximate cause, that answer was against the great weight and preponderance of the evidence.

## IV. CONCLUSION

For all the reasons stated above, the jury's failure to find appellees liable for the death of Captain Nathan Carr is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

The judgment is affirmed.

CARR, J., dissents without written reasons.