**Carolyn B. MITCHELL, Individually and as Guardian of the Person and Estate of William Meacham, Jr., an Incapacitated Person; and Louisiana Construction and Industry Self-Insurers Fund, Appellants,**

**v.**

**SOUTHERN PACIFIC TRANSPORTATION COMPANY; St. Louis Southwestern Railway Company; and Bill Reinhardt, Appellees.**

**No. 04-95-00764-CV.**

Court of Appeals of Texas, San Antonio.

July 2, 1997.

Rehearing Overruled Oct. 23, 1997.

William R. Edwards, III, Edwards, Terry & Edwards, Corpus Christi, Roberto Serna, Crystal City, Alberto M. Ramon, Law Office of Alberto M. Ramon, Eagle Pass, A. Boone Almanza, Gibson, McClure, Sarles & Wallace, Austin, David L. Perry, Rene M. Haas, Perry & Haas, L.L.P., Corpus Christi, Dennis Gibson, Gibson, McClure, Sarles & Wallace, Dallas, for Appellants.

H. Mainess Gibson, Sheryl S. Norman, Gibson & Associates, Houston, for Appellees.

Before RICKHOFF, STONE and ANTONIO G. CANTU, [1] JJ.

## OPINION

ANTONIO G. CANTU, Justice (Assigned).

This is an appeal from a take nothing judgment entered upon jury findings in a personal injury case. The lawsuit arose out of a motor vehicle/train collision which occurred in Bossier Parish, Louisiana, on May 6, 1993.[2]

Carolyn B. Mitchell (Mitchell) filed suit in Maverick County on behalf of herself and the estate of her adult son, William Meacham, Jr. (Meacham) seeking to recover damages for severe injuries sustained by Meacham while an employee/passenger in a vehicle being driven by co-employee David Toth (Toth) while in the course of their employment for Nix Upholstery, a company in the business of repairing and refinishing household furniture.

On May 6, 1993, Meacham accompanied Toth to the Maplewood Mobile Home Park off Louisiana State Highway 3, also known as Benton Road, to deliver furniture to a resident of the mobile home park. A railroad track generally runs parallel to Highway 3 in a north and south direction from Benton to Bossier City–Shreveport, Louisiana. The Maplewood Mobile Home Park is located west of the railroad tracks and of State Highway 3 and is accessed through Maplewood Drive which runs east from the park and over the railroad tracks onto the highway.

Several days before the collision, Toth had driven to the mobile home owned by Eugene and Betty Eden located in the Maplewood Mobile Home Park to pick up two chairs for refinishing. Toth had never before been to the mobile home park. On the date of the collision, Meacham, whose job was to assist Toth carry furniture in and out of homes, went along to return the reupholstered chairs to the Edens.

After delivering the furniture, Toth and Meacham left the Eden trailer, which was located one street into the park, and headed for Maplewood Drive. Toth drove onto Maplewood Drive and was struck by a southbound train at what is known as the Maplewood crossing. Meacham sustained severe, permanent and disabling brain injuries to the frontal lobe and other parts of his brain. At the time of trial Meacham's medical expenses exceeded $500,000.00, which had primarily been paid for by the Louisiana Construction and Industry Self–Insurers Fund (the Fund), Intervenor below.

In four points of error, Mitchell and the Fund (collectively appellants) contend that the jury's failure to find the liability issues in their favor was against the great weight and preponderance of the evidence, and consequently the trial court erred in not granting a new trial. In a separate point of error, appellants assert that the trial court erred in not allowing them the opportunity, at the hearing on their amended motion for new

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas.

2. Trial was under Louisiana law.

trial, to present the testimony of three jurors concerning alleged jury misconduct and outside influence.

Appellants' Fifth Amended Original Petition, in pertinent part alleged,

> At and prior to the occasion in question, the Defendants SOUTHERN PACIFIC TRANSPORTATION COMPANY and ST. LOUIS SOUTHWESTERN RAILWAY COMPANY owned and controlled a parcel of land approximately 200 ft. wide (extending approximately 100 ft. to each side of the centerline of the railroad) north of the crossing, known as the railroad "right of way;" said Defendants allowed trees, brush and other vegetation to grow in their right-of-way north of the crossing in question to such a height and extent that the same obstructed the visibility of the train for traffic approaching the crossing in question from the west, which obstruction constituted a defect or vice on land in the Defendants' care and custody and was a legal cause of the collision in question and of the consequent injuries to WILLIAM BANKS MEACHAM, JR. and damages to the Plaintiff, for which obstruction SOUTHERN PACIFIC TRANSPORTATION COMPANY and ST. LOUIS SOUTHWESTERN RAILWAY COMPANY are strictly liable....
>
> At and prior to the occasion in question, SOUTHERN PACIFIC TRANSPORTATION COMPANY and ST. LOUIS SOUTHWESTERN RAILWAY COMPANY, acting by and through their agents, servants, representatives and employees, committed acts of omission and commission which, collectively and severally, constituted negligence, negligence per se, gross negligence and malice proximately causing the collision in question and the consequent injuries to WILLIAM BANKS MEACHAM, JR. and damages to the plaintiff as follow:
>
> (1) permitting brush to grow on the railroad right-of way in such a manner as to create a sight obstruction which rendered the crossing in question dangerous, extra-hazardous and/or a "dangerous trap" under Louisiana law;
>
> * * * * * *
>
> (4) failure to maintain an adequate line of sight for vehicular traffic approaching the crossing in question;
>
> (5) failure to maintain the railroad crossing and right-of-way in question in a reasonably safe condition;
>
> * * * * * *
>
> (8) failure to correct the dangerous and/or extra-hazardous condition of the crossing in question;
>
> (9) failure to correct the conditions which cause the crossing in question to be so dangerous as to constitute a "dangerous trap" under Louisiana law;
>
> * * * * * *
>
> (14) failure to timely and properly sound the train's bells and whistles;
>
> (15) failure to timely sound an emergency whistle; and
>
> (16) failure to continuously blow the train's whistle from three hundred (300) yards prior to the crossing or in the manner provided by the Uniform Code of Railroad Operating Rules, which constituted negligence and negligence per se.

The liability issues were submitted and answered as follows:

*QUESTION NO. 1*

> Did the train fail to properly sound its whistle proximately causing the collision?
>
> "Failure to properly sound the whistle" means failing to sound the whistle in a manner in which a train crew of ordinary prudence using ordinary care would have done under the same or similar circumstances.
>
> The law requires a train approaching a public crossing to sound the whistle commencing at least three hundred (300) yards (900 feet), and prolonged or repeated until the crossing is occupied. A failure to comply with this law is a failure to properly sound the whistle.
>
> Answer "Yes" or "No"
>
> Answer: No

*QUESTION NO. 2*

Did the Railroad permit growth of grass and weeds upon the railroad right-of-way property at a height of more than fifteen (15) inches proximately causing the collision?

Answer "Yes" or "No."

Answer: No

*QUESTION NO. 3*

At the time of the collision, was there brush or vegetation growing in the right-of-way northwest of the Maplewood Crossing to an extent that it constituted a vice or defect which was a cause in fact of the collision?

A "vice" or "defect" is a condition which causes an unreasonable risk of injury to another. In determining whether or not the risk is unreasonable, you must weigh the magnitude and the probability of injury against the burden of preventing the harm.

A condition is a "cause in fact"of harm to another if that condition was a substantial factor in bringing about the harm.

Answer "yes" or "no."

Answer: No

*QUESTION NO. 4*

On the date of the collision, was the Maplewood Crossing a dangerous trap?

A railroad crossing is a "dangerous trap" when it is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train.

Answer "Yes" or "No."

Answer: No

*STANDARD OF REVIEW*

A party attacking a jury finding concerning an issue upon which he had the burden of proof must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *See Hickey v. Couchman,* 797 S.W.2d 103, 110 (Tex.App.—Corpus Christi 1990, writ denied).

In reviewing such a challenge, this court must examine the entire record to determine (1) if there is some evidence to support the finding, (2) if the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust, or (3) if the great preponderance of the evidence supports its nonexistence. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Dyson v. Olin Corp.,* 692 S.W.2d 456, 457 (Tex.1985).

Regardless of whether the great weight challenge is to a finding or a nonfinding, we may reverse and remand a case for a new trial if we conclude that the finding or nonfinding is against the great weight and preponderance of the evidence. *Ames v. Ames,* 776 S.W.2d 154, 158 (Tex.1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990). A nonfinding or "failure to find" is, therefore, reviewed in the same manner as a review of a jury's finding. *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 647 (Tex.1988).

In considering great weight points complaining of a jury's failure to find a fact, we are to be mindful that a jury was not convinced by a preponderance of evidence, *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex. 1988), and we are not to reverse merely because we may be of the opinion that the evidence preponderates toward an affirmative answer. Appellate courts are not free to substitute their judgment for that of the jury simply because they may disagree with the jury's verdict, *Herbert,* 754 S.W.2d at 144; *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 28 (Tex.1993), because to do so is to exercise our constitutional authority to review a case to the detriment of a party's right to trial by jury, a right of equal constitutional stature. *Cropper,* 754 S.W.2d at 651. Thus, we may not reweigh the evidence according to our own liking, *Dyson,* 692 S.W.2d at 458 (Robertson, J. concurring), nor may we second guess the jury's assessment of the credibility of the witnesses. *See Jones v. Tarrant Util. Co.,* 638 S.W.2d 862, 866 (Tex.1982).

Very rarely will a record disclose that the great weight and preponderance of the

evidence shows the verdict to be manifestly unjust. Given the deference merited by the trier of fact's function as arbiter of credibility issues, judicial interference is rarely called for or warranted. But in such cases where the fact jurisdiction of this court is invoked by a factual sufficiency challenge and manifest injustice is clearly apparent, we should not hesitate to reverse and remand, even if some evidence of probative force supports the verdict. *Tarrant County Water Control & Improvement Dist. v. Crossland,* 781 S.W.2d 427, 436 (Tex.App.—Fort Worth 1989, writ denied), *overruled in part,* 870 S.W.2d 21 (Tex.1994). This is especially true where it is shown that a jury completely disregarded undisputed evidence and admissions in favor of general conclusory statements denying negligence. *See Caterpillar Tractor Co. v. Cropper,* 767 S.W.2d 813, 817 (Tex.App.—Texarkana), *writ denied, improvidently granted,* 777 S.W.2d 709 (Tex.1989).

When addressing a great weight point complaining of a jury's failure to find a fact, a reversal is appropriate only when a detailing of the evidence, under the criteria indicated in *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986), demonstrates that the great weight of that evidence supports an affirmative answer. *Herbert,* 754 S.W.2d at 144. In such a case, we must, in our opinion, detail the evidence relevant to the issue in consideration and clearly state why the jury's finding (or nonfinding) is factually insufficient or is so against the great weight and preponderance of the evidence as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias. Moreover, we must state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict. *Pool,* 715 S.W.2d at 635; *Jaffe Aircraft Corp.,* 867 S.W.2d at 28.

We think, however, that the better practice is to comply with the *Pool* requirements in a review of great weight points regardless of whether we ultimately reverse or affirm. *Cf. Jaffe Aircraft Corp.,* 867 S.W.2d at 29. ("Factual sufficiency review in our intermediate courts is not a one way street.")

Accordingly, we set out all the relevant evidence applicable to each issue under consideration, whether it supports or is contrary to the jury's refusal to find (nonfinding).

### *APPELLANTS' CONTENTION THAT THE TRAIN FAILED TO PROPERLY SOUND ITS WHISTLE*

Appellants' point of error number 1 asserts:

> The jury's failure to find that the train failed to properly sound its whistle proximately causing the collision was against the great weight and preponderance of the evidence, and the trial court erred in not granting a new trial.

It was shown that Louisiana law requires that a train whistle[3] be continuously blown three hundred yards from a crossing. Additionally, the railroad company's operational rule requires the crew to blow the whistle commencing not less than one quarter mile from a crossing and continuing with a prolonged or repeated whistle until the engine occupies the crossing. A crew is instructed to blow two long blasts, a short blast, and then an extra long whistle until the engine occupies the crossing. In the event that the pattern is completed prior to entering a crossing, the crew is to repeat the pattern until the train occupies the crossing. The rule is intended to provide twenty seconds of auditory warning to a motorist approaching the crossing.

### *TESTIMONY THAT WHISTLE WAS NOT PROPERLY BLOWN*

At least nine witnesses testified about the manner in which the train blew its whistle prior to entering the Maplewood crossing.

*MATTHEW ALWAY*

Matthew Alway, an employee of T.C.I. Cablevision, testified that on May 6, 1993, he and his partner, Ben Lugo, were repairing a cable outage along the eastside of State Highway 3 and Vanceville Road near a cross-

3. Most of the testimony refers to a whistle, but it is agreed that technically a diesel horn is involved.

ing leading into the Maplewood Mobile Home Park.

Alway was setting up a ladder against a pole when he first noticed a southbound train coming down the tracks located across the highway from where he was positioned. He heard a whistle that lasted approximately three to six seconds. Some fifteen to twenty seconds later, he heard another whistle. Because he was talking to Lugo with his back to the train, Alway could not estimate the speed of the train and was not aware of its precise location. He was in the process of turning around when he heard an impact. According to Alway, only three to five seconds elapsed between the second whistle and the impact. The whistle may have been blowing at the time of the impact, but Alway was not sure.

Alway never heard a continuous whistle from the time he heard the first whistle until he heard the impact. He never heard any bells. Alway testified that twenty-five to thirty seconds elapsed from the time he heard the first whistle until he heard the impact.

*BENJAMIN LUGO*

Benjamin Lugo arrived in a separate truck and joined Alway in working on a cable outage. Lugo was standing next to Alway when he heard a whistle. He turned around and looked toward a cotton gin located across the highway but saw nothing. Some ten to fifteen seconds later, Lugo saw a train coming from behind a shed adjacent to the cotton gin and then saw the train impact with a van at the crossing.

Lugo was positive he heard a second whistle right after he saw the train but did not know where the train was when it began to blow the second whistle. He did not remember hearing any bells nor did he remember the train blowing its whistle continuously from the time he first heard the whistle until the impact.[4]

Lugo remembered seeing the van just prior to the collision and stating to Alway, "That guy is awful close." According to Lugo, the van slowly approached the embankment at the crossing and then stopped. He described the approach as a "creep" and was of the belief that the van was stopped at the time of impact.

*SANDRA ROBBINS*

Sandra Robbins[5] was visiting her friend, Brenda Wells, who lived with her boyfriend, Michael Williams, in one of the mobile homes at the park. Immediately prior to the collision, she and Brenda were sitting outside sunbathing some three blocks from the collision site and conversing with each other. Robbins was facing east towards the Maplewood crossing when she heard a short whistle to the north of the trailer park and felt the vibration of a train. The whistle lasted between fifteen and twenty seconds[6] according to Robbins. The whistle and vibrations were first noted from what Robbins estimated to be a third of a mile away. Although the whistle was short, she continued to feel the vibrations of the train. She never heard any bells.

Robbins' familiarity with the area told her that the crossings are about one third of a mile apart. She thus believed that the whistle she heard was blown at the crossing immediately to the north of the Maplewood crossing. Robbins did not hear another whistle until the train entered the Maplewood crossing and impacted with the van.[7]

After Robbins heard the first whistle and while she was still feeling the vibrations, she saw a van driving on the road parallel to the tracks and closest to the tracks, turn onto Maplewood Drive and heading towards the railroad tracks as if attempting to go across. Robbins saw the van stop, and saw the brake lights for about five to ten seconds at a point some twenty feet from the tracks. She then saw the van attempt to cross and, while

4. In an earlier statement, Lugo stated that the train was still blowing its whistle when it came from behind the shed.

5. Robbins is hearing impaired but is able to hear whistles.

6. In an earlier statement, Robbins described the first whistle as lasting a very short two to three seconds. During her live testimony, she described the period as being three to four seconds.

7. During redirect examination, she testified that the train did not blow its whistle a second time.

doing so, collide with the train some five to seven feet from the point where she first noted the brake lights. Robbins expressed the opinion that the driver stopped and looked in both directions because the van was stopped long enough to do so.

Robbins described the van's approach to the crossing in some detail. She characterized the approach as "inching up" because the brake lights would go on and off as the van got closer to the tracks. According to Robbins, trains did not routinely whistle much prior to the collision. She admitted to having a premonition that there would be an accident because trains did not blow their whistles longer.

*BRENDA WELLS*

Brenda Wells testified through an interpreter for the deaf. She stated that she was sitting and conversing with Robbins by sign language at the time of the collision. According to Wells, she was facing away from the tracks and did not hear a train whistle but felt the vibrations and recognized that a train was approaching. In the past she has been able to hear a short train whistle once in a while. According to Wells, she may have heard a short whistle just prior to the impact.

*MICHAEL WILLIAMS*

Michael Williams had lived in the trailer park for nine months prior to the collision. On the day of the collision, he had spent time with his girlfriend Wells and her friend Robbins sunbathing. Immediately prior to the collision, Williams entered the mobile home to get dressed. When he returned outside, he saw the train blocking the crossing and learned about the collision.

According to Williams, trains habitually blew a short whistle when passing through the crossing immediately to the north of the Maplewood crossing which was approximately one third of a mile away. Moreover, trains would routinely not blow another whistle until some twenty to thirty seconds later when it reached a point between the cotton gin and a storage shed at which time they would blow one or two long toots lasting from five to ten seconds. Williams never heard a continuous blowing of the whistle between the crossing north of Maplewood and the Maplewood crossing.

*MICHAEL HENRY*

Michael Henry, Well's seventeen year old son, was inside the mobile home talking on the telephone at the time of the collision. He felt the vibrations of the train for about thirty seconds prior to hearing a whistle which lasted about one or two seconds before the impact. Henry testified that the train did not blow its whistle for the fifteen seconds prior to entering the Maplewood crossing. According to Henry, trains often waited until they were right up to the crossing before blowing their whistle and then would briefly blow it only once.

*BETTY AND EUGENE EDEN*

The Edens did not live in Maplewood Mobile Home Park, but owned a trailer house which they used for vacations and which was kept at the park. Their trailer was located at the closest proximity to the Maplewood crossing.

Betty and Eugene were both at their trailer house when the collision occurred. Toth and Meacham had just delivered two reupholstered chairs to their trailer. At the time of the collision, Betty was standing by an open door while Eugene was outside putting his dogs in the car. Eden did not perceive Toth and Meacham to be in a hurry when they left. Eugene did not hear the train nor its whistle before he heard the impact, but he conceded that he was not paying attention to such things. According to Eugene, some trains occasionally go through the crossing without whistling. But he agreed that as a general rule they did whistle.

Betty was not aware that a train was approaching until she heard a whistle two seconds before the impact. Betty claimed that she had never had trouble hearing train whistles when they were blown. She believed the train did not blow its whistle until the train crew spotted the van.

According to Betty, trains sometimes blew whistles and sometimes they did not do so. She described the whistle blowing as varying between the different crews. Sometimes she viewed the manner of blowing the whistle as lackadaisical. She admitted she could not

state when the train engineer blew the whistle, but could only relate that she heard it blow.

*RICHARD SILVEY*

Richard Silvey lived at the trailer park for about two years prior to the collision. At the time of the collision, he was outside his mobile home working on a boat. He recalled hearing a "thump" and immediately knowing what it meant. He did not recall hearing a whistle blow for the Maplewood crossing. Silvey related that on one occasion the train had not blown its whistle until it was already on top of the crossing. But Silvey admitted that, typically and routinely, trains blew their whistle two to three times before going through the crossing and that the whistle is so loud as it goes by the trailer park that one has to cover his ears because of the loudness.

*MICHAEL JANOFF*

Michael Janoff, a consultant in transportation and traffic safety in the areas of vision, visibility and visual perception, testified as an expert witness for appellants and expressed the opinion that the train did not give the required signal to warn the motorist of its approach according to Louisiana law. His opinions were, however, based upon the assumption that all of the trailer park witnesses were correct and believable because of the consistency between the various witnesses.

*THE RAILROAD'S TESTIMONY THAT IT PROPERLY BLEW THE WHISTLE*

*R.L. LUFT*

R.L. Luft was the train engineer on the day of the collision. Luft testified that he was required to have in his possession, on a day to day basis, a copy of the General Code of Operating Rules given to him by Southern Pacific.

According to Luft, policy requires him to blow the whistle upon passing a "whistle board" [8] which are located approximately a quarter of a mile from a crossing. The rules require two long blasts, a short blast, and an extra long blast until the train occupies the crossing. The rules also require bell ringing.

*ROBERT JIMMERSON*

Robert Jimmerson was the conductor and Luft's crew partner on the day of the collision. Jimmerson testified that the maximum allowable speed on the run from Shreveport to Alden Bridge was fifty miles per hour. According to Jimmerson, the train was depreciating its speed because it was approaching the next stop at "Cart." He estimated speed at the time of impact to be thirty-eight to forty miles per hour. Jimmerson stated that he heard screams and the application of air brakes by Luft just prior to the collision. He felt that the application of air brakes and the impact occurred simultaneously.

Jimmerson related that the train departed from Lewisville heading toward Shreveport and had just passed Benton. He described the route as containing many crossings between Benton and the Maplewood crossing. He considered Luft to be a competent engineer who performed his duties according to the rules.

*STEVE PORTER*

Trooper Steve Porter of the Louisiana State Police was the investigating officer at the scene. He received a call from his dispatcher at 3:50 p.m. and arrived at the scene six minutes later. Porter spoke to several witnesses but did not obtain statements. He recalled interviewing the train engineer, Luft, and the conductor, Jimmerson. According to Porter, Luft told him he was traveling forty nine miles per hour. He also told Porter that the train was not equipped with an event recorder or that the recorder was not in operating condition. In any event, an event recorder was not available to Porter.

Luft told Porter that his visibility was not obstructed in any manner and that he saw the van as it crossed in front of him. Luft further stated that he could see the driver and that the driver never turned his head towards the train, even though the train was blowing its whistle.

8. A whistle board was described as a sign on a pole that has a white background and a black X.

*TESTIMONY THAT TRAINS CUSTOMARILY FAILED TO BLOW THEIR WHISTLES PROPERLY*

*KELLY WOODS*

Kelly Woods lived at the trailer park for a time and testified that occasionally trains did not blow their whistles. Woods related an incident when he approached the Maplewood crossing by easing up to the tracks and a train blew its whistle right before it entered the intersection. According to Woods, the train was about fifteen to twenty yards from his car when the train blew its whistle for the first time. He recalled stopping his car within three feet of the train.

*RAY MARTINEZ*

Ray Martinez was retained by appellants to investigate and record on video trains running through the vicinity of the Maplewood crossing. Martinez was a retired law enforcement officer with thirty years of experience. Martinez had served as a police officer for the city of Austin, as a Texas Department of Public Safety narcotics agent, and as a Texas Ranger.

Martinez was instructed to go to Louisiana over a year after the collision to observe the habit of trains in the area of the crossing. His concentration was in observing whether trains blew their whistles at the whistle boards. Martinez and his assistant, Byron Smith, recorded on video tape various trains running south in the Benton–Bossier City area. During the three days spent investigating, Martinez never saw a train blow its whistle properly at a whistle board on the southbound run. He admitted seeing one train comply on the northbound run.

According to Martinez, trains were recorded traveling in excess of the allowable speed, sometimes traveling up to fifty-five miles per hour. On rebuttal, Martinez testified that during his investigation at the scene, he was almost hit by an oncoming southbound train at the Maplewood crossing when the train failed to blow its whistle until the last few seconds before entering the crossing.

*BYRON SMITH*

Byron Smith accompanied Martinez to Louisiana to do retained investigation. Smith, a former law enforcement officer, served with the Texas Department of Public Safety for twenty-eight years. While in Louisiana, he and Martinez made about eight or nine video tapes of trains blowing and not blowing their whistles. Smith personally observed a train crew fail to blow its whistle properly at the Maplewood crossing during his investigation while video-taping. Smith testified that while he was standing at the Maplewood crossing, he was unable to hear a train approaching until it blew its whistle by the cotton gin.

*JANET JOHNSON*

Janet Johnson is Richard Johnson's wife. The Johnsons live approximately one hundred fifty yards from the Maplewood crossing. Janet remembered hearing different patterns of whistles from trains running by. On the day of the collision, she was sitting in her trailer working on her children's homework when she heard a train whistle north of the trailer. She did not remember if the train blew its whistle at the Maplewood crossing [9] but remembered hearing the impact.

According to Janet, only ten percent of the trains running through the crossing blow their whistles from crossing to crossing. The other ninety percent blow their whistles intermittently. Generally, southbound trains blow a brief whistle one third of a mile north of the Maplewood crossing and then again twenty-five to thirty seconds later just before entering the Maplewood crossing.

*THE RAILROAD'S TESTIMONY THAT IT CUSTOMARILY BLEW THE WHISTLE PROPERLY*

*RONALD SPRAGUE*

Ronald Sprague, a Southern Pacific employee designated as an expert on the subject of whistle rules, testified that according to Southern Pacific and St. Louis Southwestern Transportation Company policies, Luft should have blown the whistle for one quar-

9. Later on during her testimony, she stated that about twenty-five to thirty seconds elapsed from the time she heard the first whistle until the second whistle blew at the Maplewood crossing.

ter of a mile prior to the Maplewood crossing with two long blasts, a short and long blast, and should have entirely covered the crossing prior to stopping the whistle. He further stated that both members of the crew are jointly responsible for compliance with the rules regulating whistles.

*NOLAN R. HARRELL*

Nolan R. Harrell, an emergency medical technician with the Benton Volunteer Fire Department, testified that he was aware that trains traveling south from Benton to Shreveport blow their whistles around the Maplewood area. In his opinion, the whistles are blown in such a manner that one can set his time by them. However, Harrell was not able to state that the trains sound their whistles properly.

*OBIE HAMITER*

Obie Hamiter was assigned to patrol duty for the Bossier Parish Sheriff's Department on the day of the collision. Hamiter patrolled State Highway 3 daily and observed trains moving north and south parallel to the highway blowing whistles at the various crossings.

*RICHARD JOHNSON*

Richard Johnson, a staff sergeant in the United States Air Force, was a resident of Maplewood Mobile Home Park for about four months prior to the collision. While a resident at the park, he noted that train whistle blowing varied in patterns. According to Johnson, some would blow continuously from approximately the crossing north of the Maplewood crossing all the way to the next intersection (the Maplewood crossing). Some would blow intermittently prior to entering each crossing. It was Johnson's opinion that ninety percent of the trains traveling through the Maplewood area blew their whistles intermittently as opposed to continuously.

*BILLY LYNN REINHARDT*

Billy Lynn Reinhardt, a named defendant and corporate representative at trial, testified that he was engineer of maintenance on the eastern region, an area covering several states. Reinhardt worked directly under the vice-president chief engineer of the eastern region of the Southern Pacific Transportation Company. He agreed that the rules and regulations that govern the Cotton Belt track are identical to those that govern the Southern Pacific track. According to Reinhardt, at or about the time of the collision, about eight trains went across the Maplewood crossing daily, each with a different crew of two.

*DISCUSSION*

■ It is abundantly clear that there was much conflict in the evidence, not only within the appellees' witnesses but within the testimony of appellants' witnesses as well. Many of the witnesses who testified that they did not hear a whistle prior to the accident also testified that they were preoccupied or were otherwise in a situation that did not readily afford them ideal conditions or predisposed them to attentiveness for train whistles.

Eugene Eden testified that on the day of the collision he was not paying attention to whether the train blew its whistle. Michael Henry testified that when the collision occurred, he was inside a trailer talking on the telephone with a friend. Janet Johnson testified that she did not remember if the brain blew its whistle at the Maplewood crossing because she was assisting her children with their homework. Richard Silvey testified that at the time of the collision he was focused on a boat project. Brenda Wells is hearing impaired and was not always able to hear the whistles of trains passing through the crossing. None of appellants' witnesses were specifically listening for a train whistle, and the fact they may not have heard one or could not remember hearing one does not compel the conclusion that the train did not blow its whistle properly. The jury was not required to believe that the railroad did not blow its whistle properly any more than it was required to believe that it had done so.

Appellants minify the railroad's evidence on the proper blowing of its whistle by pointing out that not a single *disinterested* witness testified that the train properly blew its whistle prior to entering the Maplewood crossing. It further criticizes the railroad because Luft, the train engineer, although available at trial to be called as a witness,

was not called to testify other than by video deposition.

However, it was appellants' burden to prove by a preponderance of the evidence that the whistle was not blown properly, not the railroad's burden to show that it did. Since appellants' evidence on the issue of improper whistle blowing was not without internal conflict, it did not compel an affirmative answer to the jury question. One such example of conflict may be seen in the deposition testimony of the witness Phillip Martinez, a portion of which was read to the jury.[10] Martinez testified he heard seven or eight whistle blasts with a pause between each whistle. Appellants' expert witness Janoff agreed that if there were seven or right blasts and each only lasted one second, then that would equal seven or eight seconds of whistle. Thus, a gap of even only a half second between each whistle would amount to ten or eleven seconds of whistle. Janoff further agreed that if Martinez testified that sounds terminated with the impact, it would indicate that the whistles were blown in the last ten or eleven seconds prior to impact.

Jury question number one asked the jury to find both, whether the whistle was properly blown and whether any such failure to do so was the proximate cause of the collision. Thus, even if the jury had found that the railroad did not blow its whistle properly, the jury could, nevertheless, have been satisfied that the whistle was adequately blown and, therefore, not a proximate cause of the collision. The jury's answer may well have been based on a failure to find either negligence or proximate cause. *See Carr v. Jaffe Aircraft Corp.*, 884 S.W.2d 797, 802 (Tex.App.—San Antonio 1994, no writ).

Additionally, there was some evidence that Toth may have been guilty of negligence in failing to properly enter the crossing and that such negligence was the proximate cause of the collision. Other evidence suggested the contrary.

We are not required to speculate on what alternative circumstance may have caused the collision. Nor was it the railroad's burden to prove another cause for the collision. It is sufficient that the jury, from the evidence before it, may not have been convinced by a preponderance of the evidence that the railroad's failure to properly blow its whistle caused the collision.

The evidence regarding Toth's approach to the crossing was, therefore, not without conflict and although we may be persuaded that appellants' version is the more plausible one, we are not at liberty to disregard the deference owed to the fact finder's role in this matter.

As this court recognized in *Gunn Buick, Inc. v. Rosano,*

> There is justification for this doctrine for where this court deals with a cold ... record of words, the jury has the advantage of not only hearing the testimony, but also seeing the witnesses and all the surrounding circumstances that play a part in the processes of determining credibility.

*Gunn Buick, Inc. v. Rosano,* 907 S.W.2d 628, 631 (Tex.App.—San Antonio 1995, no writ).

Appellants' exhibits alone numbered over one hundred, some of which were blowups, including a massive aerial view of the crossing and surrounding area. The latter was used extensively by the various witnesses to demonstrate elapsed time between whistles and impact as described by the various witnesses. These demonstrations provided the jury with numerous alternatives in support of the positions advanced by both parties. The jury being privy to the demonstrations contemporaneous with the testimony was afforded an advantage not available to the reviewing court. All of these trial techniques become a part of the credibility sifting process and require this court to remain vigilant that it not usurp the jury's function, however strong the temptation may be.

We must remain ever cognizant of the fact that it is for the jury, as the trier of fact, to judge the credibility of the witnesses, to assign the weight to be given their testimony, and to resolve any conflicts or inconsistencies

10. Martinez did not otherwise testify. His testimony was selectively used to cross examine Janoff.

in the testimony. *Rosano,* 907 S.W.2d at 630.

In *Jaffe Aircraft Corp.,* our Supreme Court reminded us:

> Central to our system of justice is reliance upon the fact finder to resolve disputed issues of fact. In Texas this usually means that a jury, composed of a cross section of a local community, will be entrusted with the vital responsibility to act as "the sole judges of the credibility of the witnesses and the weight to be given their testimony."

*Jaffe Aircraft Corp.,* 867 S.W.2d at 28.

When we review the record, guided by these considerations, we cannot justifiably conclude that the jury's negative answer manifestly demonstrates itself to be clearly contrary to the evidence.

But even if we were to concede that the evidence preponderates in favor of an affirmative answer, still, under the record before us, we cannot say that the *great* weight of the evidence compels an affirmative answer, and we are precluded from sustaining appellants' challenge unless we are able to say that it does. *Herbert,* 754 S.W.2d at 144. Nor does the jury's negative finding shock the conscience or clearly demonstrate bias. *Pool,* 715 S.W.2d at 635. Point of error number one is overruled.

### *THE VEGETATION CONTROL AND OBSTRUCTED VISIBILITY*

Appellants' point of error number 2 asserts:

> The jury's failure to find that the railroad permitted growth of grass and weeds of more than fifteen inches proximately causing the collision was against the great weight and preponderance of the evidence, and the trial court erred in not granting a new trial.

Point of error number 3 asserts:

> The jury's failure to find that there was brush or vegetation growing in the right-of-way northwest of the Maplewood crossing to an extent that it constituted a vice or defect which was a cause in fact of the collision was against the great weight and preponderance of the evidence, and the trial court erred in not granting a new trial.

Point of error number 4 asserts:

> The jury's failure to find that the Maplewood crossing was a dangerous trap was against the great weight and preponderance of the evidence, and the trial court erred in not granting a new trial.

The court's charge asked the jury if the railroad permitted growth of grass and weeds upon the railroad right-of-way at a height of more than fifteen inches which proximately caused the collision. The jury was also asked if there was brush or vegetation growing in the northwest right-of-way that constituted a vice or defect which was a cause in fact of the collision. "Vice or defect" was defined as "a condition which causes an unreasonable risk of injury to another." The charge instructed that in determining whether a risk is unreasonable, the jury must weigh the magnitude and the probability of injury against the burden of preventing harm. Finally, the jury was asked whether the Maplewood crossing was a dangerous trap on the date of the collision. The charge defined a railroad crossing as a dangerous trap "when it is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train."

Louisiana statutory law requires railroads to comply with municipal ordinances regulating the grass and weeds on rights-of-ways within the incorporated limits of a municipality and three miles beyond those limits. La. Rev.Stat. Ann. § 45:323 (West 1982).[11]

11. La.Rev.Stat. Ann. § 45.323(D) (West 1982) provides:

> All railroads, except those owned and operated by a political corporation, railways and street railway companies in any incorporated municipality within the state, shall comply with the provisions, rules and regulations of the governing body of such municipality concerning the cutting of grass and weeds on rights of way within the incorporated limits of a municipality and extending three miles outside the incorporated limits.

The Maplewood crossing is less than three miles outside the incorporated limits of Bossier City, Louisiana. A Bossier City ordinance made it unlawful for any railroad to permit grass and weeds to grow more than fifteen inches in height upon any railroad right-of-way property.[12] It was undisputed that the railroad owns and controls a right-of-way to the north of the Maplewood crossing that extends one hundred feet on either side of the tracks.

In addition to the statutory requirements, the railroad had its own rules governing vegetation control. The applicable railroad rule at any given crossing depended on whether the crossing was public or private. A public crossing is one the public generally uses, and a private crossing is one requested by an individual. At a private crossing, the landowner retains responsibility to keep vegetation clear. The railroad assumes responsibility for controlling vegetation at all public crossings.

At a public crossing, the railroad is required to keep vegetation clear in a rectangular area two hundred fifty feet on either side of the road and extending fifty feet either side of the railroad tracks. Within that area, the railroad is supposed to keep the vegetation cut so that motorists using the crossing can see approaching trains.

Although the railroad was not aware that the Maplewood crossing was a public crossing at the time of the collision, it was stipulated between the parties at trial that the Maplewood crossing was a public crossing and that "it was the responsibility of the railroad and not the responsibility of the adjoining landowner to meet whatever obligations exist for vegetation control at the crossing."[13]

Thus, the railroad was required to keep vegetation clear in an area two hundred fifty feet on either side of Maplewood Drive and fifty feet on either side of the tracks.

### *EVIDENCE THAT DENSE BRUSH OBSTRUCTED VISIBILITY*

#### *BILLY LYNN REINHARDT*

Billy Lynn Reinhardt, the designated corporate representative, testified that he learned, through oral instructions received while advancing up the ranks, that the railroad was required to keep vegetation clear for fifty feet from each side of the track to two hundred fifty feet on the approach at public crossings. Reinhardt understood that he was required to keep the vegetation cut to the point that it did not constitute a visual obstruction for a motorist. He always understood the Maplewood crossing to be a private crossing.

According to Reinhardt, much of the vegetation control is done by spraying chemicals from a spray train or a truck. The tracks are sprayed directly, as is an area twelve feet on each side from the center line of the tracks. Additionally, railroad personnel inspect for vegetation growth along the tracks and at public crossings. Reinhardt, however, admitted that the railroad was not, according to his best knowledge, required to do anything with respect to vegetation at the Maplewood crossing.

Reinhardt was familiar with the Maplewood crossing and was aware of the private trailer park located there. He was also aware of the high traffic at the crossing and was particularly aware that the crossing, from the standpoint of safety, needed to be maintained as safely as if it were a public crossing. To the best of his knowledge, the railroad never did anything to the Maplewood crossing until after the collision. He admitted that the railroad could have treated the Maplewood crossing the same as a public crossing if it had chosen to do so, but con-

**12.** Bossier City, La. Ordinance No. 22 of 1984, § 24–6 provides:

> An Ordinance Amending and Re–Enacting Chapter 24 of the Bossier City Code of Ordinances Entitled "Railroads"
>
> Section 24–6 Maintenance and Removal of Weeds and Grass on and along Railroad and Railway Rights–of–Ways.
>
> (a) It shall be unlawful for any railroad, railway and street railway company whose tracks are laid in and through the city of Bossier to suffer or permit the growth of grass and weeds upon any railroad right-of-way property, at a height of more than fifteen (15) inches.

**13.** Ownership was previously established by summary judgment.

sciously chose not to do so. Reinhardt testified that at or about the time of the collision, at least eight trains went across the tracks daily, each with a different crew of two.

According to Reinhardt, the railroad was required to keep vegetation below the line of sight of someone sitting in the driver's seat of a passenger car. He agreed that if the vegetation at the crossing was so high on the date of the collision, that people could not see an oncoming train, and if the crossing was a public crossing, then the railroad failed to do that which it should have done and that the railroad operated a train through a crossing that was dangerous.

*ANCIL BOATMAN*

Ancil Boatman is the president of S.S.I. Mobley Company, Inc., a firm that contracted with the railroad to provide vegetation control services in the area, including the Maplewood crossing. S.S.I. Mobley provided a vegetation control program known as a road bed program. The program called for S.S.I. Mobley to control vegetation twelve feet from the center line of the tracks. According to Boatman, S.S.I. Mobley could have provided vegetation control at the Maplewood crossing by simply turning on different nozzles that would spray fifty feet on either side of the track. The railroad's contract, however, called for S.S.I. Mobley to spray only the road bed at Maplewood under an erroneous belief that the Maplewood crossing was not a public crossing.

The lack of vegetation control at crossings such as Maplewood became the subject of discussions between S.S.I. Mobley and the railroad in 1991. Reinhardt sent a letter to S.S.I. Mobley on September 18, 1991, in which he wrote that the railroad was very dissatisfied with S.S.I. Mobley's vegetation control in the district in which the Maplewood crossing was located. Reinhardt requested a joint inspection to discuss the problems and to try to implement solutions as needed to correct them. The joint inspection revealed that Reinhardt's concern was a lack of vegetation control at private crossings and other areas where the railroad had not contracted for crossing control. S.S.I. Mobley sought to add private crossings to the contract but railroad upper level management declined to do so.

*THE TRAILER PARK RESIDENTS*

*SANDRA ROBBINS*

Sandra Robbins described the brush north of the Maplewood crossing as being seven to eight feet tall. She described it being so thick as to not be able to see through it. According to Robbins, she had to drive up to five feet of the track to see a train approaching. Robbins recalled the brush being cut a few days after the collision. She considered the high thick brush to be dangerous and claimed to be in fear each time she pulled up to the crossing. She had a premonition there would be an accident because of the condition of the brush and the failure of trains to whistle longer.

*MICHAEL WILLIAMS*

Michael Williams described the brush to the north of the crossing along the tracks as average height, six to eight feet tall, beginning seven to eight feet from the track. He further described the brush as dense but claimed he could see through it. He, however, felt a motorist would not be able to see a train approaching from the north unless he got to within ten to fifteen feet of the tracks. Williams claimed that the area was cleared out with a defoliant within a week of the collision.

*EUGENE EDEN*

Eugene Eden had consistently experienced problems seeing to the north of the crossing because of the vegetation that was high and quite dense. Eden considered the density of the brush to present a safety problem when crossing the track. According to Eden, he was required to get as close as eight feet from the tracks to see around the brush. He recalled that the vegetation was subsequently sprayed following the collision.

*BETTY EDEN*

Betty Eden described the brush at the crossing as being a safety hazard. She stated that she customarily approached the crossing with extreme caution because her trailer was fifty-five feet long. She described how she was required to get very close to the tracks to look northward for

approaching trains because of the undergrowth and trees. She estimated having to move up to within eight feet of the tracks in order to observe oncoming trains. Eden recalled the brush being cleared away a few days following the collision.

*MICHAEL HENRY*

Michael Henry described the approach to the crossing as being obstructed by big brush and weeds. He considered the brush and weeds to be a safety hazard because it required a person approaching the tracks to get real close to the tracks, within four or five feet of tracks, to see if a train was approaching. He described having to get close to tracks and having to lean over the steering wheel to check for approaching trains before crossing.

*RICHARD SILVEY*

Richard Silvey described the condition north of the crossing as "terrible [because] you couldn't see." Silvey was aware of various complaints being made by the residents of the trailer park. According to Silvey, a motorist could not see down the tracks unless he got to within five to ten feet from the nearest rail. He considered the brush to present a safety hazard and described the brush and vegetation as "a mess." When confronted with the photograph taken by the railroad four days after the collision, Silvey disagreed with the view as depicting the condition at the time of the crossing. He described the photo as an "image error." He made numerous complaints to the owner of the trailer park about the crossing, without any results. Silvey personally observed the brush north of the crossing being cut down the day after the collision.

*KELLY WOODS*

Kelly Woods testified that the brush and vegetation at the crossing was so dense that a motorist could not see the tracks behind. According to Woods, a motorist was required to get within three feet of the tracks to see down the tracks. Woods considered the crossing to present a safety hazard.

*RICHARD JOHNSON*

Richard Johnson arrived at the scene while the train was still there and was not able to drive into the park. Johnson parked his vehicle across the street and walked through the crossing. As he walked across, he observed towards the north and saw underbrush approximately one hundred fifty feet up from the crossing that he felt provided obstruction. He described how typically he approached the crossing as close as five to seven feet from the tracks before he felt comfortable enough to believe that a train was not approaching from the north. He expressed the opinion that the underbrush created a safety hazard because it required him to get too close to the tracks before crossing.

*JANET JOHNSON*

Janet Johnson testified that, prior to the collision, the brush did not completely block the view of the tracks. According to Johnson, the brush probably blocked perhaps thirty feet north of the entrance to the trailer park. She described the brush as being six feet in height or taller. Although she could see the tracks through the dense brush by getting real close, she insisted a train would not be visible.

She described having to get to within eight and ten feet of the tracks before she was able to safely determine if a train was approaching. She felt uncomfortable at a distance further then ten feet because she would not be able to determine if a train was approaching because of the brush.

*TOM WALKER*

Tom Walker, the owner of the trailer park, testified he had on one occasion, called the railroad to complain about the brush and visibility at the Maplewood crossing quite a while before the collision.

*BRENDA WELLS*

Brenda Wells described the brush north of the crossing as thick. She was not able to see through it when approaching the crossing. According to Wells, she had to get to within three to four inches of the tracks to make sure a train was not approaching before she felt it was safe to cross the tracks. She testified that the brush was probably cut the same day of the collision. Wells considered the crossing to be unsafe and stated that she almost got killed at the crossing on one occasion.

*WITNESSES OTHER THAN TRAILER PARK RESIDENTS*

*MATTHEW ALWAY*

Matthew Alway was familiar with the Maplewood Trailer Home Park because he had been there at least three or four times prior to the collision. Prior to the collision, Alway described having to pull to within four or five feet from the tracks to get a good line of sight down the tracks to where he felt comfortable enough to cross. According to Alway, a couple of weeks after the accident, he did not have to pull up as close because it seems to him that brush had been trimmed so that he could obtain a good sight from perhaps fifteen feet from the tracks. Alway felt that four to five feet from the tracks was not much of a safety hazard, however, he did not feel comfortable about it.

*MICHAEL JANOFF*

Michael Janoff, appellants' expert witness, testified that he relied upon the Railroad Highway Grade Crossing Handbook for established parameters for how far down the tracks a motorist needs to be able to see a train from various positions at crossings such as the Maplewood crossing. Janoff felt that even after the brush was cut and by August of 1993, the crossing did not meet the criteria laid out by the federal government for a safe crossing. Nevertheless, Janoff admitted that the brush presented no visual obstructions for a vehicle stopped with its front bumper ten feet from the rail. He further admitted that a driver could probably see at least seven hundred feet down the tracks from that position.

In Janoff's opinion, the Maplewood crossing is a dangerous trap or dangerous crossing as defined by the State of Louisiana. He further expressed the opinion that the railroad's property, because of the overgrowth of brush, presented an unreasonable risk of injury to motorists using the crossing.

Janoff, however, admitted that all of his opinions assumed that all of the testimony of the trailer park residents was correct and credible.

During depositions, four other witnesses drew their rendition of the brush as it was on the date of the collision. The drawings were admitted by agreement without reading the witnesses' deposition. These depictions of the brush show that brush obscured motorists' view of the track.

*THE RAILROAD'S TESTIMONY THAT BRUSH DID NOT OBSTRUCT VISIBILITY*

*JAMES GLEASON*

James Gleason, a foreman for the Cotton Belt, works maintaining track and doing repairs. Gleason testified that he inspected railroad tracks seven days a week and that he had never seen high vegetation at the Maplewood crossing.

*JOHN HAROLD LAUGHLIN*

John Harold Laughlin formerly worked for the railroad for forty-two years. At the time of trial, Laughlin was retired and doing consultation work. His specialty was evaluating crossings to determine whether they needed protection, whether they are safe, and whether they can be used safely.

Laughlin was hired to evaluate the crossing in question and to give an opinion whether the crossing is extra hazardous or might constitute a dangerous trap. After delineating the criteria he used to evaluate the Maplewood crossing, Laughlin concluded that nothing in the crossing created a hazard or unusual danger to a person using the crossing. He also concluded that the crossing was not a dangerous trap under Louisiana law because a driver could see a train before he got into a danger zone and that the crossing was not an extra hazardous crossing under Texas law because a driver using ordinary care could have passed over the crossing in safety using a standard cross buck. Laughlin, however, agreed with appellants' attorney that under a hypothetical presented,[14] the crossing would be a dangerous crossing.

*MacARTHUR TURNER*

MacArthur Turner was an employee of the Cotton Belt and at the time of trial held the

14. Laughlin agreed that, if the trailer park residents were correct in how they described the vegetation at the Maplewood crossing, then the crossing was a dangerous trap.

position of roadmaster over the area of tracks which included the Maplewood crossing. Turner testified that, as part of his responsibilities, he covered his territory at least once a week on his pickup truck which sat on high rails and rode the rails. Members of his crew inspected the track on a daily basis looking for problems, including obstructions to vehicles. Normally, Turner would not concern himself with private crossings, but he admitted that occasionally he cleared obstructions at private crossings, although perhaps not as well or as far back as he would at public crossings.

Turner denied that vegetation at the Maplewood crossing was ever in the condition described by the trailer park residents. He claimed that an inspector with the Federal Railroad Administration would have brought it to his attention if it had been otherwise. Turner claimed that the Maplewood crossing exhibited adequate visibility for a motorist to see an approaching train coming from the north. He denied that the railroad crews cleared out the area prior to the taking of a photograph by the appellees, admittedly taken four days after the collision. Turner did, however, admit that he had cleared out the Maplewood crossing in September of 1994 in response to complaints by the trailer park owner. According to Turner, the owner wanted permission from the railroad to go on the right-of-way to do the cutting himself.

*NOLAN R. HARRELL*

Nolan R. Harrell worked as an emergency medical technician with the Benton Volunteer Fire Department on the day of the collision. Although Harrell did not perform an accident investigation, he did not see anything at the Maplewood crossing that would have obstructed the view of a motorist heading west to east at the time of the collision to keep him from seeing a train approaching from the north.

Harrell had never been at the crossing when a train came through and he, therefore, did not know how close he would have to get to the tracks in order to see down the tracks. He was not able to say what it looked like to the north of the crossing on the day of the collision. Nevertheless, Harrell testified that the photograph taken by the railroad four days after the collision was representative of the scene at the time of the collision.

*OBIE HAMITER*

Obie Hamiter, a deputy sheriff with the Bossier Parish Sheriff's Department, was assigned to patrol duty on the day of the collision. Hamiter was dispatched to the scene of the collision to handle crowd control, not to investigate the incident. He remained at the scene for about an hour.

Hamiter was familiar with the crossing, having patrolled it for sometime, at least twice a week. Prior to trial, he gave a statement stating that he did not recall the condition of the brush at the crossing at the time of the collision. Nevertheless, at trial, Hamiter testified that he had never, during his crossings, seen vegetation at the crossing as described by the trailer park residents. Moreover, he had never seen any unsafe condition at the crossing in all the times he had been there.

Hamiter also testified that the photograph taken by the railroad four days after the collision, was representative of the scene of the crossing on the day of the collision. Moreover, he felt that there was nothing to obstruct an eastbound motorist's view of a southbound train.

*JAMES HILBOURN*

James Hilbourn, a deputy sheriff with the Bossier Parish Sheriff's Department, was a patrol supervisor on the day of the collision. He responded to a dispatch by making the scene but did not conduct any investigation. Hilbourn remained at the scene until the train and the van were removed.

Hilbourn had, on previous occasions, been through the crossing while on patrol but did not remember driving over the crossing on the day of the collision. He did, however, remember making observations that day while standing on the tracks or on the road next to the tracks.

Prior to trial, Hilbourn gave a written statement in which he stated that he did not recall the condition of the vegetation at the crossing at the time of the collision. Nevertheless, testifying live, Hilbourn stated that the photograph taken by the railroad four

days after the collision, represented the condition of the crossing at the time of the collision, Moreover, Hilbourn testified that no condition obstructed the view of a train to a motorist approaching the crossing.

Hilbourn believed he later went into the park and drove across the tracks. He further thought he had surveyed the situation out there in terms of safety to motorists and did not see anything that would obstruct a motorist's view looking north. Hilbourn stated he had never seen the condition of high vegetation described by the trailer park residents, but admitted that the residents of the trailer park probably had a much higher level of awareness of the condition of the brush than he did.

*HERMAN HARRELL GIBSON, JR.*

Herman Harrell Gibson, Jr. was the driver of the ambulance on the date of the collision as an employee of the Benton Fire District. He drove his ambulance across the crossing when he arrived and as he left. Gibson made it a point to observe the visibility at the crossing because someone at the scene had made a comment about the visibility at the crossing. He saw no obstructions as he crossed the tracks.

During his deposition, Gibson was reluctant to acknowledge the condition of the crossing at the time of the collision. Nevertheless, at trial, Gibson agreed that the photograph taken by the railroad four days after the collision generally represented the scene as it existed at the time of the collision.

Subsequent to the collision and just prior to trial, Gibson, at the request of the railroad, visited the Maplewood crossing. He testified that he stopped at a point where he felt, as he recalled the scene, he could see an oncoming train from the north. Measurements taken by Gibson showed that the front of his vehicle was twenty-four feet from the nearest rail and thirty-two feet to the driver's seat. Gibson saw nothing that would obstruct a driver's visibility of oncoming trains.

Gibson further testified that he had been to the scene a number of times after the collision and that the visibility had remained essentially the same. He admitted that the vegetation condition was different but insisted that the visibility remained the same. Gibson, however, agreed that the residents of the trailer park should have a better awareness of the condition of the crossing but, nevertheless, insisted that visibility was sufficient for safety.

*STEVE PORTER*

Steve Porter, a member of the Louisiana State Police, was stationed at Bossier City as a road trooper and was the investigating officer at the scene. Porter received a dispatch at 3:50 p.m. and arrived at the scene six minutes later. When he arrived, sheriff's deputies were already at the scene and the train had already been cut to allow access to the other side of the crossing. While at the scene, Porter spoke to numerous people, including conductor Luft and engineer Jimmerson. Porter did not attempt to measure the distance from the track to the road to ascertain the visibility down the tracks. He took no pictures and did not step back from the tracks to see what he could see, except for stepping back ten feet from the track on the side of the crossing where the van stopped prior to the collision. In his official report, Porter made notations that no vision obscurements existed to either the van or the train. Porter explained that if a question of visibility had come up, he would have spent more time examining the visibility at various distances from the tracks. Porter was led to believe that visibility was not an issue by the engineer who had stated to him that he plainly saw the van as it crossed in front of him.

Porter was previously familiar with the crossing and offered the opinion that the crossing was reasonably safe for the use of a motorist exercising ordinary care for his own safety by keeping a lookout on the day in question.

*CHARLES R. RUBLE*

Charles R. Ruble, an accident analyst, testifying in behalf of the railroad, stated that he had examined the accident report prepared by Trooper Porter, the Louisiana Manual on Uniform Traffic Control Devices, numerous photographs, twelve statements, twenty to twenty-five depositions, and all Louisiana traffic laws. He also stated that

he had visited the scene of the collision to do a visibility study with measurements. Ruble expressed the opinion that a motorist stopping fifteen feet from the crossing would have no problem seeing an approaching train if he looked in the right direction. At that position, Ruble felt the train would have been plainly visible to a motorist. Ruble concluded that the driver of the van failed to look, to listen, and to yield the right-of-way to a train that was plainly visible and in hazardous proximity to him. Moreover, he also concluded that the driver violated Louisiana traffic laws requiring him to stop and yield to an approaching train.

However, Ruble conceded that the physical evidence was in conflict with and contrary to what engineer Luft said about the van driver's speed and approach to the crossing.

■ Our review of the evidence and consideration of the guidelines previously pronounced leads us to the same conclusion. Once again the issue presents a swearing match between two versions, both of which cannot be correct, but each of which contains testimony that lends some support to the competing version. The resolution of credibility issues, conflicts, and inconsistencies must remain with the trier of fact. *Commonwealth Lloyd's Ins. Co. v. Thomas,* 678 S.W.2d 278, 289 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.).

The crucial issue revolves around whether the railroad's photograph of the crossing identified as exhibit DX–1, admittedly taken four days following the collision, truly represents the condition of the crossing at the time of the collision. Another issue to be resolved was the date the railroad cleared out the brush. The evidence is not totally in harmony. According to Sandra Robbins, the brush was cut a few days after the collision. Michael Williams remembers the area being defoliated within a week of the collision. Eugene Eden can only remember the area being sprayed sometime following the collision. According to Betty Eden, the area was cleared a few days following the collision. According to Silvey, the brush was being cut down the day after the collision. Brenda Wells supposed that the brush was probably cut the day of the collision. MacArthur Turner denied that the railroad had cleaned out the area prior to the taking of the photograph identified as DX–1 but admitted that the cleaning occurred subsequent to the taking of the photograph. Under the state of the evidence, only the testimony of Silvey and Wells conclusively contradicts the position advanced by the railroad. The other testimony is capable of supporting either version. The jury resolved the issue against appellant and from the record before us, we cannot say that the resolution is against the great or overwhelming weight and preponderance of the evidence, much less that the finding is manifestly unjust, that it shocks the conscience, or that it clearly demonstrates bias.

Moreover, Hamiter, Hilbourn, and Gibson all agreed that the photograph was representative of the scene at the time of the collision. Hamiter and Hilbourn are both peace officers while Gibson was the ambulance driver. We have been directed to nothing in the record to indicate that the testimony of these witnesses is inherently unworthy of belief.

The jury's failure to find proximate cause clearly finds some support in the testimony of Ruble, who proffered his conclusion that the collision was the result of Toth's failure to look, to listen, and to yield the right-of-way to the train that was plainly visible and in a hazardous proximity to him. Much of Ruble's testimony finds support in the testimony of Janoff, appellants' expert witness, who agreed that a motorist whose bumper was ten feet from the crossing would be able to see in excess of seven hundred feet north of the crossing.

Much of the evidence was in conflict while at the same time tending to support either version. An affirmative finding would not have been against the great weight and preponderance of the evidence, but neither is a negative answer. The facts were close and it cannot be said that the evidence clearly preponderates overwhelmingly in favor of either version. Points of error two, three and four are overruled.

*ALLEGED JURY MISCONDUCT*

■ Appellants' final point of error asserts:

> The trial court erred by not allowing Appellants the opportunity at the hearing on their Amended Motion for New Trial to present the testimony of three jurors concerning jury misconduct and outside influence.

Appellants' amended motion for new trial alleged in pertinent part:

> A new trial should be ordered because improper communications were made to the jury prior to the beginning of deliberations and based on the record as a whole, such improper communications probably resulted in harm to the Plaintiff.
>
> * * * * * *
>
> A new trial should be ordered because material jury misconduct occurred when the jury discussed matters outside the record prior to the beginning of deliberations, and based on the record as a whole, such material jury misconduct probably resulted in harm to the Plaintiff.

In support of the amended motion for new trial, appellants attached the affidavits of juror Jose Guadalupe Salazar and Alberto M. Ramon, an attorney of record representing the Louisiana Construction and Industry Self–Insurers Fund.

Salazar's affidavit included the following statements:

> On the last day of trial, in the morning, before the evidence started, juror Simpson said that Mr. Ramon [counsel for intervenor] had called to the junior high asking if there were several faculty members whose spouses had relatives who worked for the Southern Pacific Railroad. The two ladies were very upset that those inquiries were being made about them at their school. I believe the other juror was Juror Jiminez, a special education teacher.
>
> * * * * * *
>
> Prior to the deliberations, several of the jurors were commenting that this case had been filed in Eagle Pass because Eagle Pass is known to be the number one county in Texas for bringing lawsuits. Miss Simpson even said that she had a magazine article to that effect. I don't remember if she had it with her or not. It was commented that people thought that Eagle Pass jurors were stupid, and would just give money away and that the jury should put a stop to that sort of thing.

Ramon's affidavit set out his efforts to discuss the case with some of the jurors. It then proceeded to detail alleged remarks attributed to an alternate juror. According to the alternate juror, the jurors had been discussing the case from the very beginning, including matters such as alleged racial prejudice of counsel for appellants. It is also stated in the affidavit that remarks were made by the jury that, regardless of the evidence in the case, the jury had a duty to prevent anyone and everyone from filing cases in Eagle Pass because the populace was being perceived as dumb Mexicans who gave away money to anybody. The affidavit also states that the affiant Ramon also learned that there was a feud between the son of Jury Foreperson Arturo Guajardo and the District Attorney who had served as a co-counsel for appellants, and that the existing hostility had resulted in Guajardo making derogatory remarks to the other jurors about the District Attorney prior to the deliberations.

Ramon further stated that there was a report that two or more jurors had discussed the case with an employee of the Eagle Pass Junior High and that there had been communications between someone at the Eagle Pass Junior High School and one or more of the jurors prior to deliberations that apparently caused the jurors to react negatively to appellants' case.

At the hearing on the Amended Motion for New Trial, appellants attempted to call Salazar, Guajardo and Simpson as witnesses. The trial court refused to allow any testimony from these jurors.[15]

Appellants argue that the trial court erred in refusing to hear testimony because the amended motion for new trial with the supporting affidavits mandate the reception of testimony under the language of Tex.R. Civ.

15. Appellants did not seek to preserve the rejected testimony by bill of exceptions. *Cf. Soliz v. Saenz,* 779 S.W.2d 929, 931 (Tex.App.—Corpus Christi 1989, writ denied).

P. 327(a) if the allegations are of jury misconduct or communications made to the jury.

TEX.R. CIV. P. 327 provides in pertinent part:

> RULE 327. FOR JURY MISCONDUCT
>
> a. When the ground of a motion for new trial, supported by affidavit, is misconduct of the jury ... or because of any communication made to the jury, ... the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the communication made, ... be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.
>
> b. A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict concerning his mental processes in connection therewith, except that a jury may testify whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

TEX.R. CIV. EVID. 606(b) provides in pertinent part:

> RULE 606. COMPETENCY OF JUROR AS A WITNESS
>
> (b) Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Under both rules, all testimony, affidavits and other evidence is excluded from consideration by the court when an issue regarding jury misconduct is raised unless it is shown that an "outside influence was improperly brought to bear up any juror." *Durbin v. Dal-Briar Corp.,* 871 S.W.2d 263, 272 (Tex. App.—El Paso 1994, writ denied); *Moody v. EMC Servs., Inc.,* 828 S.W.2d 237, 243 (Tex. App.—Houston [14th Dist.] 1992, writ denied); *Soliz v. Saenz,* 779 S.W.2d 929, 931(Tex.App.—Corpus Christi 1989, writ denied); *Kendall v. Whataburger, Inc.,* 759 S.W.2d 751, 755 (Tex.App.—Houston [1st Dist.] 1988, no writ); *Robinson Elec. Supply Co. v. Cadillac Cable Corp.,* 706 S.W.2d 130, 132 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.).

Prior to the adoption of the new rules of evidence in Texas and, specifically amended rule 327(b) of the rules of civil procedure, a party complaining of jury misconduct had to show (1) that the misconduct occurred; (2) that it was material; and, (3) that based on the record as a whole, the misconduct probably resulted in harm to the complaining party. *See Redinger v. Living, Inc.,* 689 S.W.2d 415, 419 (Tex.1985). Only overt acts of the jury were considered, and any testimony concerning the jury's mental processes was disregarded. *Strange v. Treasure City,* 608 S.W.2d 604, 606 (Tex.1980). Under Rule 327(b), as amended, and Rule 606(b), jurors may not now testify to any matter or statement occurring during the course of the jury's deliberations, unless the testimony concerns outside influence which affected the decision. *See Perry v. Safeco Ins. Co.,* 821 S.W.2d 279, 281 (Tex.App.—Houston [1st Dist.] 1991, writ denied); *Baley v. W/W Interests, Inc.,* 754 S.W.2d 313, 316 (Tex.App.—Houston [14th Dist.] 1988, writ denied); *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 849 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dismissed,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988). Such a limitation on a juror's testimony is a significant change from the prior practice in jury misconduct cases. *Robinson Elec. Supply Co.,* 706 S.W.2d at 132.

Neither the Rules of Civil Procedure nor the Rules of Civil Evidence define "outside influence," but case law has attempted to provide a narrow definition. An "outside influence" must emanate from a source outside the jury and its deliberations. *See Robinson Elec. Supply Co.*, 706 S.W.2d at 132; *Clancy v. Zale Corp.*, 705 S.W.2d 820, 829 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). Thus, it has been suggested that an outside influence might encompass a non-juror who introduces the information to affect the verdict. *Perry*, 821 S.W.2d at 281; *Soliz*, 779 S.W.2d at 932; *Baley*, 754 S.W.2d at 316.

To preserve error regarding jury misconduct, the complaining party must present evidence proving the misconduct at a hearing on a motion for new trial. Tex.R. Civ. P. 324(b)(1); Tex.R. Civ. P. 327. Although this evidence may generally include testimony from any person with knowledge of the misconduct, jurors may not testify about their deliberations or their mental processes during deliberations, but only about any outside influence that was improperly brought to bear on any juror. *Wooten v. Southern Pacific Transp. Co.*, 928 S.W.2d 76, 78 (Tex.App.—Houston [14th Dist.] 1995, no writ). Rule 327(a) mandates that the court hear evidence of juror misconduct if it is properly presented. *Texaco, Inc.*, 729 S.W.2d at 851.

However, a motion for new trial based on jury misconduct must be supported by a juror's affidavit alleging that "outside influences" affected the jury's decision. *Weaver v. Westchester Fire Ins. Co.*, 739 S.W.2d 23, 24 (Tex.1987). And a non-juror's affidavit is not sufficient to establish material jury misconduct because the affidavit is based on hearsay. *Clancy*, 705 S.W.2d at 828; *Tenngasco Gas Gathering Co. v. C.E. Fischer*, 624 S.W.2d 301, 305 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.). While case law has not readily identified what constitutes an "outside influence," it has not shied away from rejecting certain conduct as constituting "outside influence". Thus, it has been held that information gathered by a juror and introduced to the other jurors by that juror, does not add up to "outside influence," even if introduced specifically to prejudice the vote. *Soliz*, 779 S.W.2d at 932; *Baley*, 754 S.W.2d at 316. Nor does coercive influence of one juror upon the rest of the panel constitute "outside influence." *Perry*, 821 S.W.2d at 281. Even a juror's injection of his own personal experiences, knowledge, or expertise will not be considered as an "outside influence" because such is said to emanate from inside the jury. *Soliz*, 779 S.W.2d at 932; *Kendall*, 759 S.W.2d at 755. Likewise, any conversation regarding the case occurring between or among jurors is a part of jury deliberations, regardless of the time and place where it occurs. *Durbin*, 871 S.W.2d at 272; *Baley*, 754 S.W.2d at 316.

A motion for new trial alleging jury misconduct unsupported by affidavits of jurors clearly demonstrating outside influence does not require the receipt of testimonial evidence. *See Weaver*, 739 S.W.2d at 24–25. The post trial affidavits of Salazar and Ramon do not meet the threshold requirement of outside influence. In Salazar's affidavit, each alleged event took place in open court or was related to information attributable to other members of the jury. The closest thing to outside influence in Salazar's affidavit is the statement in which he claims that on the last day of trial and prior to the beginning of the evidence, juror Simpson said that Ramon had called the junior high where she and another juror worked, asking if there were faculty members whose spouses had relatives working for Southern Pacific Railroad.[16] These conversations, if they occurred, were improper and in violation of the court's continuing instructions, but they do not constitute the outside influence contemplated by the rules. A similar contention was raised and rejected in *Wooten v. Southern Pacific Transp. Co.* wherein the appellant sought to extend the term "outside influence" to include any influence emanating from outside the evidence and not just limited to situations when a non-juror influences the jury. The Houston Court of Appeals, in

16. Juror Simpson did not provide an affidavit but was present at the hearing on appellants' motion for new trial.

rejecting the contention, recognized that just such contention was expressly precluded by the Supreme Court when it amended rule 327(b). *Wooten*, 928 S.W.2d at 78.

The affidavit of Ramon also fails to establish any influence emanating from outside the jury. His affidavit is hearsay as it is based upon a conversation he had with the daughter-in-law of the alternate juror, Frances Vargas. *Clancy,* 705 S.W.2d at 828; *Tenngasco Gas Gathering Co.*, 624 S.W.2d at 305. According to the affidavit, hearsay statements twice removed, indicate that the jurors made various comments about how they perceived the trial. None of the alleged conduct, although not commendable, approaches the type of conduct contemplated by the rules. In each of the alleged instances, the source of the alleged conduct was the jurors themselves. In the absence of a clear showing of abuse of judicial discretion, an appellate court is bound by the trial court's determination as to the occurrence of jury misconduct. *McCormick v. Texas Commerce Bank Nat. Ass'n,* 751 S.W.2d 887, 892 (Tex. App. Houston [14th Dist.] 1988, writ denied), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3199, 105 L.Ed.2d 706 (1989).

The amended motion for new trial with accompanying affidavits do not reflect that any outside influence was brought to bear on the jury. Accordingly, the trial court did not err in refusing to hear the proffered testimony of appellants' witnesses and in overruling the amended motion for new trial. The point of error is overruled.

In view of the disposition we make of appellants' points of error, we do not reach the cross points brought forward by the appellees. Accordingly, in the absence of error requiring reversal, the judgment of the trial court is, in all things, affirmed.

RICKHOFF, Justice, concurring.

Billy Meacham had compelling liability and damage issues. As a tactic, he chose to present them in Maverick County, Texas, rather than before a Louisiana jury, where jurors familiar with the site might have been inclined to accredit their neighbors on the determinative issue—was the horn properly sounded by the conductor on the train that hit the van in which he was riding? That this tactic may have been improvident was raised by his point of error concerning outside influence on the deliberations. Double hearsay suggests that jurors may have felt this case traveled so far because, as Hispanics, they were perceived as more sympathetic and generous,[1] and so, challenged by the stereotype, they dispelled it with their verdict. Had this point been supported by the record and occurred as outside influence the verdict would be unjust. Rumor that it is, it could be just another warning from South Texas jurors to be cautious about calling them to the courthouse.

As the majority opinion infers, these twelve jurors may have concluded that these out-of-state witnesses may have been so acclimated to train noise that they could not accurately recall the timing, number or sequence of the horn displays. These jurors were free to question the memory and perception of all the disinterested witnesses, reject their testimony and rely on the reputation of the conductor as competent. With this short addendum I join in the majority opinion.

STONE, Justice, dissenting.

Because I believe the jury's verdict on negligence and proximate cause is against the great weight and preponderance of the evidence and manifestly unjust, I respectfully dissent.

1. In *Polaris Investment Management Corp. v. Abascal,* 890 S.W.2d 486 (Tex.App.—San Antonio 1994, orig. proceeding [leave denied] ) (substituted opinion), the record showed plaintiff's attorneys sought to try a massive securities fraud case in Eagle Pass because "I got the largest verdict in the history of the United States there, and it didn't take me long to realize that's a friendly conclave." *Id.* at 487. The record also showed attorneys thought the county's status as predominantly Hispanic, as poor and with high unemployment would be reflected by individual jurors who would "identif[y] compassionately with deserving victims and sharply against corporate wrongdoing and fraud." *Id.*

**Failure To Properly Sound Whistle**

Billy Meacham sustained permanent catastrophic injuries when the van in which he was riding was struck by a train at the Maplewood Drive railroad crossing. The undisputed evidence established that Louisiana law required a prolonged or repeated sounding of the train's whistle for three hundred yards before the Maplewood crossing. There is little probative evidence, and certainly not a preponderance of evidence, that the train continuously or repeatedly sounded its whistle for three hundred yards prior to entering the Maplewood crossing and crashing into the van. Eight witnesses—none of whom had any stake in the outcome of this litigation—testified that either the train did not sound its whistle, or did not sound its whistle continuously for three hundred yards before entering the Maplewood crossing.

The two cable company employees, Alway and Lugo, both testified that the whistle did not repeatedly or continuously sound prior to the impact. Alway heard a whistle, followed fifteen to twenty seconds later by a second whistle, which lasted only three to five seconds before the impact. Similarly, Lugo testified that there was a ten to fifteen second silence between the first and second whistle, and that the whistle was not continuously sounded as it approached the Maplewood crossing.

Sandra Robbins and Brenda Wells, both of whom are hearing impaired, testified that they are able to hear train whistles despite their hearing impairments. Robbins testified that she heard only one short whistle. Her estimate of the length of the whistle varied from two to twenty seconds. More importantly, Robbins testified that the period of silence following the initial whistle until the collision was longer than the length of time the whistle sounded. Wells heard only a very quick whistle immediately before the sound of the impact. Under either woman's testimony, there was no repeated or prolonged sounding of the whistle before the train entered the Maplewood crossing. This same conclusion is reached when the testimony of Michael Henry is considered. Henry testified that the train did not repeatedly or continuously sound its whistle for fifteen seconds prior to the Maplewood crossing.

Betty Eden testified that she heard no whistle until one or two seconds before the collision, while her husband Eugene and Richard Silvey both testified that they heard no whistle before they heard the sound of the crash. Again, despite differences in their testimony, these witnesses all established that there was no repeated or prolonged sounding of the train whistle as it approached the Maplewood crossing.

The only witness who testified differently was the train's conductor, Robert Jimmerson, who shared responsibility with the engineer for sounding the whistle. Jimmerson never testified that the engineer did in fact properly sound the whistle. Rather, Jimmerson testified that he recalled the engineer as a competent engineer who performed his duties according to the rules. This meager testimony does not, in my opinion, rise to the level of probative evidence.

Louisiana law and railroad company policy required repeated and prolonged sounding of the whistle in order to warn motorists of an approaching train. The only reasonable conclusion that can be drawn from the evidence presented is that because the train crew failed to sound the whistle in the manner required, Meacham and the van driver, David Toth, failed to receive warning of the train's approach, proximately causing the collision and resulting injuries. The jury's verdict to the contrary is so against the great weight and preponderance of the evidence as to be manifestly unjust.

I am mindful that appellate courts are not to act as a second jury, merely substituting their opinion for that of the jury. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988). Nonetheless, when the factual sufficiency of the evidence is challenged, appellate courts are required to "consider and weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust—this, regardless of whether record contains some 'evidence of probative force' in support

of the verdict...." *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, (1951).

The majority points out inconsistencies in the testimony presented by Meacham, which is proper in a factual sufficiency review. But in doing so, and in reaching its conclusion that the jury's verdict is not against the great weight and preponderance of the evidence, the majority falls short in two regards. First, the inconsistencies noted by the majority are not relevant to the question of whether the train failed to properly sound its whistle. As noted above, despite differences in testimony, the various witnesses consistently testified to one controlling fact—there was no repeated and prolonged whistle sounding for three hundred yards before the train entered the Maplewood crossing.

Second, the majority discredits the testimony presented by Meacham's witnesses because they were "preoccupied" or not predisposed to "attentiveness for train whistles." Yet the majority rejects the notion that it can consider that not a single *disinterested* witness testified that the train properly sounded its whistle. Factual sufficiency review means that we review all testimony, with all its shortcomings, to determine whether the verdict is against the great weight and preponderance of the evidence. Surely it does not mean that the appellate court points out the shortcomings of the losing party's evidence, but puts on blinders to the deficiencies of the victorious party's evidence.

Accordingly, I would reverse the judgment and remand the cause to the trial court for a new trial.